IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 89-1643

---

W.O. AKIN, ET AL.,

                                  Plaintiffs-Appellants,

                     versus

Q-L INVESTMENTS, INC., Etc., ET AL.,

                                  Defendants,

LAVENTHOL & HORWATH,

                                  Defendant-Appellee.

---

Appeal From the United States District Court
for the Northern District of Texas

---

(April 15, 1992)

Before KING, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This is a suit alleging violations of state and federal securities laws and RICO by accountants who audited financial statements included in private placement memoranda. Plaintiffs appeal a summary judgment and a sanction. We reverse.

I.

Plaintiffs are 127 investors who invested in a number of tax-oriented limited partnerships syndicated between 1973 and 1985 by a group of companies known as the Quinn-L group. The Quinn-L group included four companies that served as general partners of these limited partnerships: Quinn-L Investments, Inc., SML, Inc., Quinn-

L Corporation, and Quinn-L Equities, Inc.  The group also included other companies that performed various functions for the partnerships such as management and leasing of partnership properties (Quinn-L Management Corp.), mortgage financing (Quinn-L Mortgage Co.), lending of working capital funds (Quinn-L Capital Co.), and construction of improvements on properties, (Braxton Co.).  Virtually all of the companies in the Quinn-L group were owned entirely by S. Mark Lovell.

The defendant, Laventhol & Horwath, is a national accounting firm retained by the Quinn-L group in connection with the sale of thirteen of these limited partnerships in the early 1980's.  L & H furnished reports on financial statements, some of which were included in the Private Placement Memoranda (PPMs) used in marketing the partnership investments.  L & H prepared reports on three kinds of financial statements included in the PPMs: (1) Start-up Balance Sheets, showing initial capitalization of the partnerships as either $100 or $1,000; (2) Historical Financials, reporting prior period performance for two of the partnerships being acquired by the Quinn-L Group; and (3) Corporate Balance Sheets, reporting financial statements of some of the syndicating companies.  Preparation of these reports was L & H's sole involvement with the offerings.

The partnerships were primarily involved in real estate--the construction, ownership, and management of apartment complexes and office buildings throughout the southeast.  There was a common cash management program among the various entities in the Quinn-L group

through which the general partners borrowed money from individual partnerships for use within the overall structure as needed. The partnerships were projected to have operating losses for the first five to eight years of operation, which would generate tax deductions for the limited partners. Profitable operation would follow, if all went according to plan. Success depended largely on the general partners' ability to refinance the partnerships, sell them for more than their debt, or resyndicate them. With the passage of the Tax Reform Act of 1986 and the general collapse of the real estate market in the late 1980s, approximately forty of the forty-five limited partnerships ultimately went into bankruptcy or had their properties foreclosed upon.

In 1987 and 1988, plaintiffs filed twenty-six separate lawsuits alleging violations of federal and state securities laws and RICO in the sale of the limited partnerships. L & H is a defendant in thirteen of these suits. The plaintiffs contended that L & H aided and abetted the Quinn-L partnerships in securities violations by omitting material facts from the financial reports they prepared, thereby misleading investors as to the finances of partnerships in which they were investing. The plaintiffs alleged: (1) that L & H failed to disclose that the Quinn-L group had to syndicate additional partnerships in order to survive; (2) that L & H failed to disclose that the partnerships were "integrated" in nature--that "affiliate" or "interrelated" transactions among the individual partnerships were so numerous that the financial success of each partnership depended on the others; (3) that L & H failed

3

to disclose certain contingent liabilities and the uncollectability of certain inter-company receivables, thereby distorting the companies' true net worth; (4) that L & H falsely represented that it complied with generally accepted accounting principles and auditing standards; and (5) that L & H materially aided the Quinn-L Group in the illegal sale of unregistered securities.

The suits were consolidated for discovery and trial. After nearly two years of discovery, the district court granted L & H's motions for summary judgment on the state and federal securities and RICO claims and sanctioned plaintiffs' counsel for bad faith submission of false and misleading form affidavits.

## II.

We ask "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). This rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### A. Federal Securities Claims

Congress and the SEC have constructed an elaborate regimen for the securities markets. Its central premise of disclosure finds

4

expression, in part, by defined roles for players in the complex endeavor of issuing new securities, including underwriters, lawyers, and accountants. Rule 10b-5 was at its conception a carefully crafted piece for the disclosure and enforcement apparatus. Of course that limited assignment changed dramatically with recognition that Rule 10b-5 was enforceable by a private right of action. The relevant point is that judicial acceptance of private enforcement of Rule 10b-5 by an implied right of action came when the courts were far more hospitable to such ventures. This implied right brought with it an expansive judicial enterprise of developing a supporting common law.

The implication of such private rights of enforcement is no longer favored. Moreover, it is now apparent that open-ended readings of the duty stated by Rule 10b-5 threaten to rearrange the congressional scheme. The added layer of liability not for directly violating Rule 10b-5 but for aiding and abetting such violation is particularly problematic. Imposing liability upon traditional participants in the securities markets by resort to this theory presents greater risks of frustrating the congressional scheme of securities regulation than direct enforcement of the rule. There is a powerful argument that these risks are such that aider and abettor liability should not be enforceable by private parties pursuing an implied right of action. We must accept the law of this circuit acquiescing as it does in such suits. There are formidable arguments, however, against recognizing this cause of action--arguments that have grown with judicial insistence that

5

Congress legislate; that is, with increasing judicial reluctance to undertake legislative tasks. We should be exacting in determining whether aider and abettor liability can be demonstrated.

Plaintiffs argue that L & H aided and abetted violation of Rule 10b-5[1] by preparing false and misleading reports on financial statements. There are three routes by which an accountant may be held liable under the rule. First, an accountant is directly liable for intentional or reckless[2] misrepresentations if he knows his statements will be communicated to third parties. <u>See, e.g.</u>, <u>Fine v. American Solar King Corp.</u>, 919 F.2d 290, 298 (5th Cir.

_____

[1]"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, . . . (1) to employ any device, scheme or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made, not misleading, or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (1991); 15 U.S.C. § 78j(b).

[2]In <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185 (1976), the Supreme Court held that scienter was a required element of the implied cause of action under section 10(b) and Rule 10b-5. The Court expressly left open the question whether reckless behavior constitutes intentional conduct sufficient to impose civil liability, but noted that "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some acts." <u>Id</u>. at 193 n.12.
    Since <u>Ernst & Ernst</u>, this court has recognized that "severe recklessness" can satisfy the scienter requirements for a primary violation under Rule 10(b) in <u>Broad v. Rockwell Int'l Corp.</u>, 642 F.2d 929, 961-62 (5th Cir.) (en banc), <u>cert. denied</u>, 454 U.S. 965 (1981); <u>see also</u> <u>Shivangi v. Dean Witter Reynolds, Inc.</u>, 825 F.2d 885, 889 (5th Cir. 1987). Although we used the modifier "severe," our definition of severe recklessness is the same as that used by other circuits to describe conduct they consider to be reckless. <u>See</u> <u>Woods v. Barnett Bank</u>, 765 F.2d 1004, 1010 n.9 (11th Cir. 1985).

1990); Admiralty Fund v. Hugh Johnson & Co., 677 F.2d 1301, 1312 (9th Cir. 1982); Chemical Bank v. Arthur Andersen & Co., 552 F. Supp. 439, 454-55 (S.D.N.Y. 1982), rev'd on other grounds, 726 F.2d 930 (2d Cir. 1984). Here the labels "aiding and abetting" and "secondary liability" are really misnomers, since § 10(b) prohibits any person from making false or misleading statements "in connection with" the purchase or sale of a security, even if the person plays an auxiliary role in the transaction.

Second, an accountant may be held liable for knowingly joining and substantially assisting in the misrepresentations of another, regardless of whether he makes any false statements of his own. Although the Supreme Court has twice reserved decision on liability for aiding and abetting a violation of Rule 10b-5, see Herman & MacLean v. Huddleston, 459 U.S. 375, 379 n.5 (1983); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 191-92 n.7 (1976), this Circuit, in common with other courts of appeals, has consistently recognized the validity of this theory. Abell v. Potomac Insurance Co., 858 F.2d 1104, 1115 (5th Cir. 1988), vacated in part on other grounds sub nom. Abell v. Wright, Lindsey & Jennings, 109 S. Ct. 3242 (1989); Bane v. Sigmundr Exploration Corp., 848 F.2d 579 (5th Cir. 1988); Woodward v. Metro Bank, 522 F.2d 84 (5th Cir. 1975). Like any conspiracy to defraud, this route generally requires knowledge of the fraud and intent to join in it.

This court has cleared a third path more circuitous than the other two. By this route, an accountant may be held liable for recklessly aiding and abetting a primary violation regardless of

7

whether he has made misrepresentations of his own, when his assistance in the fraud is particularly substantial and unusual or when he owes some special duty of disclosure. Woodward, 522 F.2d at 97; Abell, 858 F.2d at 1127; see also Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44-47 (2d Cir.), cert. denied, 439 U.S. 1039 (1978); Woods v. Barnett Bank, 765 F.2d 1004, 1010, 1011 (11th Cir. 1985); Cleary v. Perfectune, Inc., 700 F.2d 774, 777 (1st Cir. 1983). This "theory" of liability is mushy and difficult to apply. Were we writing on a clean slate, it would give us pause. The path has two serious overlapping problems. First and foremost, the source and scope of the accountant's duty to disclose is uncertain. It does not directly rest on any textual provision of the federal securities laws, but appears to be a specie of federal common law. Its murky source infects efforts to define its scope. When an accountant's duty is unfettered from the duty to prevent falsity as proscribed by Rule 10b-5, it becomes an independent duty to disclose information "material" to a reasonable investor's decision akin to the duty owed by a fiduciary. We are not persuaded that the accountant's duty under 10b-5 is so open-ended. As we see it, this third path differs from conspiracy and the usual principles of aiding and abetting insofar as it allows liability for reckless disregard of facts indicating a client's fraud and the accountant's assistance in it. Fortunately, only a narrow band of cases can travel this path--where an accountant has furnished substantial and non-routine services but is not consciously furthering primary violations by his client.

8

(1) Start-Up Balance Sheets

Six PPMs contained start-up balance sheets indicating the initial capitalization of the limited partnerships as $100 or $1,000. The balance sheet of the Timber Ridge--Fort Worth partnership, for example, stated simply that the assets of the partnership consisted of $100 cash and that the general partner's equity investment was $100. L & H reported that this balance sheet fairly represented the financial position of the partnership at its inception, in conformity with generally accepted accounting principles. The start-up balance sheet also included a brief statement that the partnership intended to acquire a 206-unit apartment complex and offer 35 limited partnership interests to no more than 35 limited partners. The district court found that, given the narrow purpose of such a balance sheet, it had virtually no potential for misleading investors about the nature of the partnership. This conclusion, however, rests on L & H's version of what should have been included in the balance sheets and accompanying footnotes.

Plaintiffs' experts disagreed with L & H as to what generally accepted accounting principles required to be disclosed on the start-up balance sheets and their accompanying footnotes. According to Bailey, the facial anemia of the balance sheets and footnotes imposed on L & H the obligation to disclose in its reports certain material facts omitted from the footnotes. The balance sheets and footnotes largely omitted discussion of related party transactions. Had L & H met its professional standards of

10

investigation and disclosure, according to Bailey, it would have noted the absence of the following from the start-up balance sheets:

(1) Quinn-L's primary source of financial support came from continued offerings.

(2) In order to keep the companies and partnerships solvent, Quinn-L had to continue to offer new deals and sell projects.

(3) Seldom did any prior syndications ever meet their optimistic projections.

(4) Quinn-L commingled the funds of each partnership with the funds of every other partnership. Cash was used wherever needed, according to Quinn-L's Cash Control Manager. Thus, funds raised in a new offering automatically went to support prior losing ventures.

According to Bailey, L & H knew of the related party relationships, was aware of the cash management system and commingling of funds, and should have reported the omission of these material matters from the balance sheets and footnotes to avoid misleading investors. A reasonable trier of fact could conclude from this evidence that L & H was intentionally or recklessly deceiving the users of these balance sheets by failing to disclose these facts.[3]

_____

[3]I am scribe for the panel but I do not agree that summary judgment should be reversed with respect to the start-up balance sheets. In my view, these brief and accurate statements about the de minimis capitalization of the partnership could not have misled investors in any way. The amorphous "facts" which plaintiffs' experts alleged were omitted are a far cry from the specific distortions alleged in the corporate balance sheets. Violation of accounting principles is relevant to a determination of whether an auditor has committed securities fraud, but it does not reduce plaintiffs' responsibility to show that they were misled. Rule 10b-5 prohibits the use of manipulative or deceptive devices, not the violation of accounting principles. The two are not coextensive. I would affirm with respect to the start-up balance sheets.

11

(2)  Historical Financials

Two PPMs contained historical financials reporting on the prior period performance of particular limited partnerships that were being resyndicated.  Plaintiffs have not alleged that these reports misrepresented or omitted any material facts.  Hence, they cannot form the basis of a securities violation.

(3)  Corporate Balance Sheets

Five PPMs contained corporate balance sheets reporting on the financial statements of Quinn-L Investments, Inc.  Each corporate balance sheet included a statement of assets, liabilities, and shareholders' equity, a statement of revenue, expenses, and retained earnings, and a statement of source and application of funds, along with extensive notes.  L & H asserted that these corporate balance sheets were examined in accordance with generally accepted auditing standards (GAAS) and fairly represented the financial position of Quinn-L Investments in accordance with generally accepted accounting principles (GAAP).

Plaintiffs contend that these reports contain several misrepresentations regarding affiliate transactions--loans, sales and other business dealings between Quinn-L Investments and other entities in the Quinn-L Group.  For example, plaintiffs' expert stated that it was improper for L & H to characterize a note receivable from Braxton Co. for more than $7 million as an asset of Quinn-L Investments in the 1984 report. Without this related-party transaction, Quinn-L Investments would have had a minimal or negative net worth.  Plaintiffs' expert asserted that Quinn-L

12

Investments' treatment of the note receivable was a clear violation of GAAP, since both companies participated in a common cash management system in which funds were freely transferred between companies having excess cash and those in need of it. According to this expert, the transaction was not in substance a sale but part of a scheme to create inflated and fictitious values. L & H failed to qualify its report to reflect this violation as required by GAAS.

Similarly, plaintiffs' expert stated that including another $5 million note receivable as an asset on the 1983 report artificially inflated the net worth of the company since the receivable was from an affiliated partnership. Although Quinn-L's previous accountant had apparently not included this receivable on the 1982 statement, L & H "reclassified" it in 1983. The expert asserts that this "reclassification" materially distorted the financial position of the company. GAAS, he continues, required L & H to discuss any restatement of accounts with the previous accountant and disclose the nature of these discussions in its report, so that investors would know what had taken place. L & H failed to do so.

Plaintiffs' expert observes that Quinn-L Investments obligated itself to pay affiliated partnerships $37 million in rental payments for various commercial properties over the course of several years. The company then assigned its obligations under these leases to another affiliate, Nashville Feature & Music, Inc., but remained obligated. Because Nashville was financially unable

to honor this obligation, the expert asserts that GAAS required L & H to disclose its contingent liability.  L & H did not do so.

Although L & H disclosed that Quinn-L Investments was one of several companies under common control, and therefore was a member of a common cash management program for the benefit of the group, plaintiffs' experts provide at least some evidence from which a jury might infer that L & H intentionally or recklessly misled investors about the true financial position of Quinn-L Investments. This is so despite disclosure of the broader relationship between the partnerships.  That disclosure certainly blunted the deceptive effect of any inflated figures, but it did not eliminate it.  The repeated violation of accounting principles reinforces the evidence of deception.  Fine, 919 F.2d at 297.  A reasonable jury could infer from the evidence in this case that L & H was intentionally or recklessly deceiving the users of its statements by distorting the net worth of Quinn-L Investments.

L & H contends that it did not know that its reports would be included in the various PPMs used in selling the partnerships.  An accountant must know that its statements are to be communicated to investors before it can violate Rule 10b-5.  See SEC v. Texas Gulf Sulphur, 401 F.2d 833, 862 (2d Cir. 1968) ("Rule 10b-5 is violated whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public."); Zoelsch v. Arthur Andersen & Co., 824 F.2d 27, 34-35 (D.C. Cir. 1987); Mendelsohn v. Capital Underwriters, Inc., 490 F. Supp. 1069, 1085 (N.D. Cal. 1979).  Otherwise, it cannot be said that the statements are made

14

"in connection with" the purchase or sale of securities.  See
Zoelsch, 824 F.2d at 35.

In support of its contention, L & H filed an affidavit of
Christopher Mayzner, the L & H partner in charge of the Quinn-L
audit, stating that L & H was ignorant of the intended use of most
of its reports, and had no reason to believe that they would be
used in the PPMs.  However, in its memorandum in support of its
partial summary judgment motion, L & H admitted that it was aware
that some of its reports would be included in the PPMs.[4]  Further,
the value of Mayzner's testimony is limited by the fact that he did
not consult with anyone else at L & H in formulating his opinion
regarding L & H's knowledge.  Finally, plaintiffs have also
introduced evidence contradicting Mayzner.  Plaintiffs filed an
affidavit from Lovell, swearing that L & H knew that its reports
would appear in the PPMs.  Plaintiffs also offered the expert
testimony of Edmund W. Bailey, a certified public accountant, who
stated that L & H must have known that financial statements it
audited would be included in the PPMs.  Another expert, Daniel L.
Jackson, a certified public accountant, opined with regard to "The
Woodlands -1983 Limited Partnership," that L & H must have known
that its reports would be included in that PPM.[5]  This evidence is

_____

[4]L & H stated as follows:  "In some instances, L & H was
aware that these reports were intended for use in PPMs.  In other
instances L & H was not."

[5]As evidence of L & H's knowledge, Jackson cites L&H's
engagement letters for the audit of "The Woodlands - 1983 Limited
Partnership," which stated as follows:  "You have agreed to
provide us [L&H], prior to filing, proofs of the entire offering
circular and all other accompanying materials within which such

15

sufficient to create a genuine issue of material fact with respect to L & H's knowledge that its reports would be used in connection with the sale of securities.

L & H also argues that plaintiffs failed to prove that they relied on L & H's reports. While materiality can be established for all the plaintiffs as a group, reliance is a matter of individual proof. Abell, 858 F.2d at 1118 (citing Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. Unit A Mar. 1981), rev'd in part on other grounds, 459 U.S. 375 (1983)). Plaintiffs argue first that they were not required to show reliance. They contend that they are entitled to the presumption established by the Supreme Court in Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972), presuming reliance of plaintiffs who base their 10b-5 claims on omissions.

The Ute presumption, however, operates only in omissions cases, not where plaintiffs assert positive misrepresentations of material information. Finkel v. Docutel/Olivetti Corp., 817 F.2d 356, 359 (5th Cir. 1987). The distinction between the two is not always clear. In each case, a court must decide whether plaintiffs are claiming that defendants omitted information or misrepresented it. It is not enough that a claim has aspects of omission--at a sufficiently high level of generality, they all do. Ute itself involved "primarily a failure to disclose." 406 U.S. 128, 153 (emphasis supplied). Rather, we remain mindful that the Ute

financial statements are to appear." Jackson also notes that the audit programs for that limited partnership had signed slips, indicating that someone at L & H had reviewed the PPM.

16

presumption is a practical solution of the conceptual puzzle of relying on undisclosed facts.

With respect to the start-up balance sheets, we agree that plaintiffs are entitled to Ute's presumption of reliance. The claim here is essentially that L & H failed to disclose material information that should have been included to present a complete picture of the financial status of the partnerships. The claims relating to the corporate balance sheets, however, are claims of misrepresentation, not omission. L & H disclosed considerable information about the relationship between Quinn-L Investments and other entities in the Quinn-L group. Any wrong lies in ignoring accounting principles and distorting the numbers underlying the net worth of Quinn-L Investments. This is the stuff of misrepresentation and does not entitle plaintiffs to the Ute presumption.[6] We make this judgment, which is a legal call for the judge, by reaching past its peripheral aspects and probing for the gravamen, the core of the claim.

Plaintiffs offer 127 form affidavits, nearly all of which are identical, as evidence that they relied on L & H's reports. The district court struck these affidavits because they failed to conform with Federal Rule of Civil Procedure 56(e). This rule provides that when affidavits are used to support or oppose a summary judgment motion, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and

_____

[6]We do not address the fraud-on-the-market theory of reliance here since it was not raised below.

17

shall show affirmatively that the affiant is competent to testify as to the matters stated therein."  A district court is entitled to strike affidavits that do not comply with this rule.  <u>CMS Industries, Inc. v. L.P.S. Int'l, Ltd.</u>, 643 F.2d 289, 295 (5th Cir. 1981).

The affidavits stated in relevant part

> 6.    Since investing in the Quinn-L partnership(s) and, in particular, since becoming involved in this litigation, I have learned, through the investigation of my counsel, that my partnership(s), and indeed the entire Quinn-L Group of companies, including Lovell, were not as represented to me at the time I made my investment decision.  I have learned a number of facts that, had I known them at the time I was deciding to invest in Quinn-L, I would not have invested. . . .

> 10.   I also have learned that the true net worth of the general partner in the Quinn-L partnerships was not as represented in the offering materials and elsewhere. For example, I understand that the major asset of Quinn-L Investments, Inc., general partner, was an unsecured inter-company receivable that had no real prospects for payment.  Had I known that the true net worth of the general partner was negative, at the time I made my investment decision, I would not have invested.

The district court concluded that these statements were not based on personal knowledge and were inadmissible hearsay.  Here, the statements were offered only to show plaintiffs' reliance on L & H's misrepresentations, not the truth of the misrepresented facts.  These portions of the affidavits were therefore not hearsay.  Furthermore, certainly as to reliance, plaintiffs' statements were based on personal knowledge of their individual investment decisions.  Indeed, reliance is an issue about which only plaintiffs themselves are likely to have personal knowledge.

18

The district court also rejected plaintiffs' affidavits because they were submitted in bad faith. L & H showed that the affidavits were replete with false statements and that plaintiffs' counsel had not undertaken reasonable efforts to ensure their accuracy. In fact, many plaintiffs admitted that they could not swear that they had even reviewed a PPM before investing. The district court's decision to grant summary judgment against these plaintiffs was entirely appropriate since they will be unable to show actual reliance on L & H's misrepresentations. Although plaintiffs are entitled to a presumption of reliance with respect to the omissions in the start-up balance sheets, this presumption can be rebutted by a showing that plaintiff's investment decision would not have been affected even if defendant had disclosed the omitted facts. Rifkin v. Crow, 574 F.2d 256, 262 (5th Cir. 1978).

Nevertheless, all plaintiffs should not have been dismissed en masse because many of them admitted to making false statements in their affidavits. Reliance at this juncture is a matter of individual proof. Even those plaintiffs who admitted to other inconsistencies in their affidavits may still be able to show that they read L & H's reports and would not have invested had they known the true state of affairs. On a motion for summary judgment, the district court should disregard only those portions of an affidavit that are inadequate and consider the rest. Lee v. National Life Assurance Co., 632 F.2d 524, 529 (5th Cir. 1980). The district court erred in striking all the affidavits in their

19

entirety.  At least some of the affidavits may provide valid summary judgment evidence of reliance.

With respect to the theory of direct liability, our task is complete.  Although the evidence of fraud is hardly overwhelming, it is sufficient to create a jury question.  We now proceed to examine plaintiff's theory that L & H aided and abetted a Rule 10b-5 violation by Quinn-L.  Plaintiffs must show that Quinn-L violated the rule, that L & H had a general awareness of its role in the violation, and that L & H knowingly rendered substantial assistance to the violation.  <u>Abell</u>, 858 F.2d at 1126.

Defendant has not argued that specific elements of a primary violation by Quinn-L are lacking.  Rather, it asserts that there is no evidence that any of the allegedly omitted or misrepresented facts are true.  This contention is belied by the affidavits of Quinn-L employees.  Plaintiffs introduced, for example, the affidavit of Arlan Kent Bishop, a vice president and director of Quinn-L Corporation and Quinn-L Investments, who stated that the negative cash flow on particular projects could only be serviced by the continuing syndication of new projects.  Therefore, when some Quinn-L partnerships began to fail, it was inevitable that they all fail.  The partnerships were all financially dependent on each other and on continuing syndication. Furthermore, each partnership was so highly leveraged that it could not be sold, except when Quinn-L could orchestrate a sale from an earlier limited partnership to a newer one.

20

Bishop related several material facts about the partnership investments which were omitted from the PPMs. Had the investors known of these facts, they may well have decided not to purchase the limited partnership interests. Although an investor may have thought he was investing in single, independently viable partnerships, there is at least some evidence that their money was going to a shaky network of partnerships that was ultimately bound to collapse. We think this is sufficient evidence of a primary rule 10b-5 violation. Despite L & H's arguments that these facts were simply not true, whether there was a primary violation, and whether L & H assisted it by preparing misleading reports, are factual issues for a jury to determine.

Plaintiffs must also prove that L & H had the requisite level of scienter in assisting Quinn-L. As we have explained, the standard is conscious intent unless the character and degree of the assistance is unusual, or unless there is some special duty, in which case recklessness will suffice. Woodward, 522 F.2d at 97. The plaintiffs have put forth a great deal of evidence of L & H's assistance to the Quinn-L entities. The district court found that these were "financial services . . . and no more." While many, perhaps most of these services, individually considered, were routine, a reasonable jury could conclude that the overall level of involvement by L & H with the Quinn-L entities over a long period of time constituted particularly substantial or unusual assistance. If so, a recklessness standard would be appropriate.

21

Furthermore, plaintiffs may be able to establish that L & H owed a special duty to investors which justifies a recklessness standard. Courts have held that depending on the circumstances, accountants may have a duty to disclose information to investors when they make affirmative statements on which they know the investors will rely. Compare Arthur Young & Co. v. Reves, 937 F.2d 1310, 1330-31 (8th Cir. 1991); Roberts v. Peat Marwick, Mitchell & Co., 857 F.2d 646, 653 (9th Cir. 1988); Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1045 (11th Cir. 1986); Sharp v. Coopers & Lybrand, 649 F.2d 175, 180-84 (3rd Cir. 1981) (circumstances may support duty of disclosure) with Schatz v. Rosenberg, 943 F.2d 485, 496-97 (4th Cir. 1991); Zoelsch v. Arthur Andersen & Co., 824 F.2d 27, 35-36 (D.C. Cir. 1987); Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 496-97 (7th Cir. 1986); Windon Third Oil & Gas Drilling Partnership v. FDIC, 805 F.2d 342, 347 (10th Cir. 1986) (circumstances did not support duty of disclosure). Plaintiffs have produced some evidence that L & H knew that its reports would be included in the PPMs that were given to investors. They may be able to prove that L & H owed a duty and that a recklessness standard for aider and abettor liability is therefore warranted.

We accordingly reverse the summary judgment granted defendant on the federal securities claims. We do not foreclose fu2rther pretrial proceedings calculated to further shape and winnow these claims or reduce the number of plaintiffs who may go forward. The district court has the full range of its management powers and we

do not intend to limit those in any way. We have also attached some sample jury instructions on the aider and abettor theory of liability to assist the district court in formulating its charge. Our purpose is not to prepare a charge for this able district court. Rather, we use this means of explaining our ruling. We do not restrict the district court's wide discretion in submitting any claim that may ultimately go to a jury.

(4) Unregistered Securities

Plaintiffs contend that L & H violated Rule 10b-5 by aiding and abetting Quinn-L's violation of § 12 of the Securities Act of 1933, 15 U.S.C. § 77l, and § 33A(1) of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581-33 (Vernon Supp. 1992). The argument is that L & H should have disclosed that the partnerships were not registered as securities. Plaintiffs have not, however, introduced any evidence that the limited partnership interests were subject to the state or federal registration requirements, and have therefore failed to prove a primary violation. Moreover, a "seller" clearly bears the burden of proving an exemption from registration. See SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953). The district court has correctly found that L & H was not a "seller," and there is no authority for imposing on an alleged aider and abettor the burden of establishing eligibility for an exemption from registration. Summary judgment as to this issue was therefore appropriate.

B.  State Securities Claims

Plaintiffs also assert claims under Section 33(F)(2) of the Texas Securities Act.  Tex. Rev. Civ. Stat. Ann. Article 581-33(F)(2).  This section imposes joint and several liability on those persons who directly or indirectly, with intent to deceive or defraud or with reckless disregard for the truth or the law, materially aid a seller of securities who misrepresents material facts or omits material facts in connection with the sale.  See Tex. Rev. Civ. Stat. Ann. Article 581-33(A)(2).  There are few Texas decisions construing § 33(F)(2).  We take some comfort from the fact that Texas courts generally look to decisions of the federal courts to interpret the Texas Securities Act because of obvious similarities between the state and federal laws.  Star Supply Co. v. Jones, 665 S.W.2d 194,196 (Tex. App. 4 Dist. 1984).  Of course, the language of the Texas provision differs in some respects from its federal counterpart.  We think that they are sufficiently parallel in relevant ways that, on our facts, the state securities claims stand or fall with the federal claims.

The Texas Securities Act recognizes on its face, however, that recklessness satisfies the scienter requirements for aider and abettor liability.  Section 33F(2) holds liable any person, jointly and severally with the buyer, seller, or issuer, who "materially aids" with "reckless disregard" a violation of Sections 33A, B, or C.  Tex. Rev. Civ. Stat. Ann. art. 581-33F(2) (Vernon Supp. 1992).  We reverse the summary judgment on the state claims and remand for further proceedings parallel to the federal claims.

24

C.    RICO Claims

Next we consider plaintiffs' arguments that L & H violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et. seq.  To establish a RICO violation, plaintiffs had to establish (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985).

Plaintiffs argue that they have shown many acts of racketeering, that L & H's allegedly fraudulent materials were repeatedly sent through the federal mails and therefore constituted mail fraud.  18 U.S.C. § 1341.  Plaintiffs' problems of proof with respect to securities fraud do not necessarily haunt their claim of mail fraud since reliance is not an element of mail fraud.  Abell, 858 F.2d at 1129.  Proof of mail fraud requires only a scheme to defraud which involves the use of the mails for the purpose of executing the scheme.  United States v. McClelland, 868 F.2d 704, 706 (5th Cir. 1989).  Each separate use of the mails in furtherance of the scheme constitutes a separate offense.  Id.

We have already determined that there are genuine issues of material fact regarding the adequacy of the start-up balance sheets and the corporate balance sheets, including intent to defraud.  It is undisputed that these materials were repeatedly mailed to facilitate the sale of the limited partnerships.  L & H argues that it did not know that the balance sheets would be included in the PPMs; plaintiffs have produced contrary evidence.  Plaintiffs need

25

only show that it was reasonably foreseeable that the mails would be used.  Id. at 707.

Whether these acts constituted a pattern is a separate issue. The Supreme Court has recently explained the concept of a pattern of racketeering activity.  H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989).  A plaintiff must show two or more predicate acts of racketeering which are related and which amount to or pose a threat of continued criminal activity.  Id. at 239. The element of relatedness is satisfied if the criminal conduct embraces criminal acts "that have the same purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  Continuity may be established, inter alia, by a showing that the predicates "are a regular way of conducting defendant's ongoing legitimate business, or of conducting or participating in an ongoing RICO enterprise."

Here, we have little trouble in concluding that the various acts of mail fraud, if proved, would constitute a pattern of racketeering activity.  PPMs were consistently sent through the mails in an effort to sell limited partnership interests for which Quinn-L companies would serve as the general partner.  The provision of the balance sheets was L & H's regular way of participating in an ongoing and allegedly fraudulent course of conduct by the Quinn-L group.  This is enough to make out a pattern of racketeering under the RICO statute.  See Abell v. Potomac Insurance Co., Slip Op. No. 90-4737 (5th Cir. Nov. 13, 1991).

26

Finally, we must determine whether there was an enterprise in which L & H was participating. Plaintiffs assert that the RICO enterprise here was Quinn-L Corporation.[7] Under 18 U.S.C. § 1961(4), an "enterprise" can include a corporation or other legal entity. The enterprise must be an entity separate and apart from the pattern of activity in which it engages. Manax v. McNamara, 842 F.2d 808, 811 (5th Cir. 1988). Furthermore, before we can conclude that a defendant participates in the conduct of an enterprise's affairs, there must be a nexus between the defendant, the enterprise, and the racketeering activity. In this Circuit, this nexus is established by proof that the defendant has in fact committed the racketeering acts alleged, that the defendant's association with the enterprise facilitated the commission of the acts, and that the acts had some effect on the enterprise. United States v. Carlock, 806 F.2d 535, 546 (5th Cir. 1986); United States v. Cauble, 706 F.2d 1322, 1333 (5th Cir. 1983).[8]

_____

[7]It is unclear to us from the briefs and the record which partnerships involved Quinn-L Corporation and which ones involved Quinn-L Investments or other Quinn-L entities. In any event, in light of our disposition of this case, we think plaintiffs should be allowed to amend their pleadings on remand to clarify which Quinn-L entities are targeted as RICO enterprises.

[8]We note that Circuit courts have taken different views regarding "participation in the conduct" of an enterprise. See Yellow Bus Lines v. Local Union 639, 913 F.2d 948, 952-53 (D.C. Cir. 1990) (en banc) (discussing the kaleidoscope of views on this issue). The Supreme Court has recently granted certiorari to consider an Eighth Circuit case on this topic. See Arthur Young & Co. v. Reves, 937 F.2d 1310, 1325 (8th Cir. 1991), cert. granted, __ U.S. __ (1992). Until the Supreme Court speaks, we continue to apply the standard set forth in Cauble.

Quinn-L Corporation meets the definition of an "enterprise." It was an ongoing corporation that engaged in activities other than the allegedly fraudulent sales of partnership interests. L & H is a separate entity employed by Quinn-L Corporation and accused of participating in its scheme to defraud investors by distorting financial statements. L & H's association with Quinn-L provided not only the means of committing the fraud but also the motive. The effect on the enterprise was to aid in the sale of partnerships from which it reaped substantial income. Plaintiffs have established the requisite nexus.

In sum, we are persuaded that the district court erred in granting summary judgment on plaintiffs' RICO claims. We have found that the start-up and corporate balance sheets raise a genuine issue of fact as to whether L & H intended to deceive plaintiffs about the financial position of the partnerships and the net worth of Quinn-L Investments. On this record, plaintiffs are therefore entitled to take their RICO case to a jury.

### III.

Finally, plaintiffs and their attorneys object to the Rule 11 sanctions imposed for submitting affidavits not well grounded in fact and the truth of which the attorneys had not adequately investigated. Rule 11 provides in relevant part that "[t]he signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact.

28

. . . and that it is not interposed for any improper purpose." F.R.C.P. 11. Violation of Rule 11 justifies the imposition of sanctions. Robinson v. National Cash Register Co., 808 F.2d 1119, 1130 (5th Cir. 1987). We review the court's award of sanctions for an abuse of discretion. Thomas v. Capital Security Services, Inc., 836 F.2d 866, 872 (5th Cir. 1988).

In preparing their response to defendant's motion for summary judgment, plaintiffs' attorneys mailed 127 form affidavits to their clients. The plaintiffs read the affidavits, signed them, and returned them, and their attorneys then filed the affidavits in the district court with a signed pleading attached. When defendant questioned plaintiffs about these affidavits in their oral deposition, many of them admitted that many of the statements contained in the affidavits were simply not true. Furthermore, they confessed that they had not spoken with their attorneys about the affidavits or their contents--they had received the affidavits in the mail and sent them back, relying on their attorneys to verify the facts to which they were attesting. On these grounds, defendant moved to strike the affidavits and requested that sanctions be imposed on the plaintiffs and their attorneys. While this motion was pending in the district court, the plaintiffs resubmitted the affidavits with a later pleading. The district court concluded that plaintiffs' attorneys had failed to make a reasonable inquiry as to the truth of the matters asserted in the affidavits and assessed sanctions in the amount of $31,017.50.

29

We begin by noting that large attorneys' fees awards under Rule 11 often can be coercive, even debilitating, sanctions. The sheer size of some awards--tens and even hundreds of thousands of dollars--can produce "devastating professional and financial consequences." Cochran, "Rule 11: The Road to Amendment," 61 Miss. L.J. 5, 6 (1991); see also Johnson, Contois & Keeling, "The Proposed Amendments to Rule 11: Urgent Problems and Suggested Solutions," 43 Baylor L. Rev. 647, 650 (1991).

It is axiomatic that, in assessing Rule 11 sanctions, the district court must impose the "least severe sanction adequate" to accomplish the purposes of Rule 11. Thomas v. Capital Security Serv., Inc., 836 F.2d 866, 878 (5th Cir. 1988) (en banc). While the district court has broad discretion to fashion an appropriate sanction, this court on appeal must ensure that the district court discharged its duty to impose the least severe sanction adequate. In cases in which "the sanctions imposed are substantial in amount, type, or effect," appellate review of the sanctions is particularly rigorous. Id. In such cases, the district court must enter specific factual findings to assist the appellate court in its review of the Rule 11 sanctions.

Despite the substantial size of the Rule 11 sanctions in the instant case, the district court did not enter specific factual findings. The court did not indicate in the record the factors it considered in choosing a $31,017.50 sanction. It did not state in the record which alternative sanctions, if any, it also considered.

Above all, it did not explain why the sanction it imposed was the least severe sanction adequate to serve the purposes of Rule 11.

The least severe sanction adequate requirement serves a critical function: it ensures that Rule 11 does not degenerate into nothing more than a docket control device that the district courts use to punish unsuccessful litigants who dare to raise their claims or defenses in federal court. The $31,017.50 sanction in this case may well be an appropriate Rule 11 sanction. Because of its substantial size, however, this court may not affirm the sanction until the district court has entered specific factual findings determining whether the sanction is the least severe adequate to serve the purposes of Rule 11.

We vacate the sanction and remand to the district court for specific factual findings. We reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

APPENDIX

## **Instruction:  Aiding and Abetting Liability**

## **under Section 10(b) and Rule 10-b-5**

I.

The plaintiff claims that the defendant aided and abetted a violation of the federal securities law.  A person who aids and abets a violation of Section 10(b) and Rule 10b-5 may be held liable for the violation.

Plaintiff must prove by a preponderance of the evidence:

1.   That someone other than the defendant committed the securities law violation charged in the complaint.

Answer:_____
          Plaintiff did prove or plaintiff did not prove

If you have answered question 1 plaintiff did prove, then answer question 2, otherwise do not answer further questions in this set.

2.   That the defendant substantially assisted the  securities violation as found by you in question 1.

Answer:_____
          Plaintiff did prove or plaintiff did not prove

If you have answered question 2 plaintiff did prove, then answer question 3, otherwise do not answer further questions in this set.

3.   That the defendant intended to assist the securities violation as found by you in your answer to question 2.[9]

---

[9] As suggested by <u>Woodward v. Metro Bank of Dallas</u>, 522 F.2d 84, 96 (5th Cir. 1975); <u>Abell v. Potomac Ins. Co.</u>, 858 F.2d 1104, 1127 (5th Cir. 1988), <u>vacated in part on other grounds sub nom.</u>

i

Answer:_____
          Plaintiff did prove or plaintiff did not prove

As to the first element, there can be no aiding and abetting liability unless someone violated the securities laws.

As to the second element, the plaintiff must prove that the assistance rendered by the defendant was substantial.[10] Whether the assistance was substantial must be considered in light of all the surrounding circumstances.

As to the third element, the plaintiff must show that the defendant consciously intended[11] to assist the securities violation. Conscious assistance has two aspects.[12] First, the plaintiff must prove that the defendant had knowledge of the existence of the securities violation and generally understood how its actions aided in promoting the success of the securities violation.[13] Second, the plaintiff must prove that the defendant intended to further the securities violation.[14]

---

Fryer v. Abell, 492 U.S. 914 (1989).

[10] Abell, 848 F.2d at 1127; Woodward, 522 F.2d at 97 ("In any case, the assistance must be substantial before liability can be imposed under 10b-5.").

[11] Woodward, 522 F.2d at 97.

[12] Abell, 858 F.2d at 1127.

[13] Id.

[14] Id. ("The second element of scienter -- commitment -- would be met where evidence shows that the abettor acts from a desire to help the fraud succeed.").

## II.

[In cases where a duty to disclose is alleged and proved, or where the performance of services atypical of the defendants' business is alleged and proved, or where particularly substantial assistance is alleged and proved, a fourth question must be answered.  Of course, these may themselves present fact issues for separate submission to the jury.]

If you have answered question 3 plaintiff did not prove, then answer question 4, otherwise do not answer further questions in this set.

4.    That the defendant acted in reckless disregard of the fact that he assisted the securities violation as found by you in your answer to question 2.

Answer:_____
            Plaintiff did prove or plaintiff did not prove

Reckless disregard as used in question 4 means highly unreasonable conduct, not merely ordinary mistake or inadvertence. It is an extreme departure from reasonable conduct.  Reckless assistance has two aspects.  First, plaintiff must prove that defendant acted in reckless disregard of the securities violation found by you in your answer to question 1.  Second, plaintiff must prove that defendant acted in reckless disregard of the fact of his assistance.