United States Court of Appeals,

Fifth Circuit.

No. 92-3376.

Walter R. ABBOTT, M.D., et al., Plaintiffs-Appellants,

and

Mrs. E. Elizabeth Turnbull and, Louis R. Koerner, Plaintiffs-Appellants,

v.

The EQUITY GROUP, INC., et al., Defendants,

The Home Insurance Company and, the Graham Company, Defendants-Appellees.

In re Ronald C. ELLINGTON, et al., Debtors.

Mrs. E. Elizabeth Turnbull and, Louis R. Koerner, Claimants-Appellants.

Sept. 28, 1993.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before REAVLEY, DUHÉ, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

This appeal from a summary judgment turns for the most part on the reach of the federal securities laws for entities that are not the primary parties for securities violations, and on the relief *vel non* to be accorded parties who, subsequent to entry of judgment, raise a new theory of liability. Investors in Courtside Ltd., a Louisiana partnership formed to acquire and operate an apartment community in Houston, Texas, brought suit against, *inter alia,* The Home Insurance Company and The Graham Company. As to them, they alleged that Home and Graham's continued participation as surety and bonding agent respectively for the Courtside transaction, despite their knowledge of misrepresentations and material omissions in the Private Placement Memorandum, violated, *inter alia,* federal securities laws and rendered the investors' indemnity agreements with Home unenforceable. The district court granted summary judgment in favor of Home and Graham and refused, post-judgment, to allow a new theory of liability to be raised. We AFFIRM.

I.

In 1984, the Equity Group, Inc., formed Courtside, becoming the managing general partner.[1] Limited partners were required to execute a subscription agreement, which, *inter alia,* emphasized that the investment involved "a high degree of risk and special risks".  The purchase price per unit investment was a combination of cash ($1,500)[2] and credit, consisting of two promissory notes for approximately $38,000 (first note) and $7,000 (second note).

To obtain financing from Hibernia National Bank and Security Savings and Loan Association, Courtside pledged the limited partners' first notes to Hibernia as collateral;  the second, to Security. As additional security, in late December 1984, Home, through its agent, Graham,[3] issued a financial guarantee bond in favor of each bank as permitted assignee, with the Courtside investors as principals, and the partnership (Courtside) as obligee.  The bonds obligated Home to pay Hibernia up to $3,941,025 and Security up to $1,050,000.

Home received a premium of $257,060 for its issuance of the bonds (total obligation of almost $5 million).  In addition, Home required each investor to execute a pledge of partnership interest to Home, and sign an indemnity agreement protecting Home against, *inter alia,* all losses in connection with the bonds.

Graham, as agent for Home, required that each investor execute a limited partner's application for financial guarantee bond, and thus reviewed their creditworthiness.  Home reserved the right to approve the language in any financial guarantee bond as well as in the general partner indemnification agreement, the limited partner indemnification and security agreement, and the remarketing agreement.

It is undisputed that neither Home nor Graham had direct communication with limited partners or their advisors prior to their investment in the partnership;  rather, Equity solicited the

---

[1]The Equity Group, Michael B. Smuck, Mark H. Strauss, Joseph T. Michelli, and Ronald C. Ellington were named as general partners.

[2]After November 21, 1984, the cash portion of the purchase price decreased to $2,500 for two units.

[3]Graham is a property and casualty broker.  In September 1983, Home entered into a general agency agreement with it for the issuance of limited partnership financial guarantee bonds.

limited partners primarily through the Private Placement Memorandum (PPM) (twice supplemented), and oral presentations. Alleged misrepresentations and material omissions in Equity's solicitation initiatives form the basis of this action. As for Home and Graham's involvement, the investors primarily rely on a legal memorandum prepared for Graham by the Duane, Morris & Heckscher (Duane Morris) law firm.

In the course of analyzing the transaction for Home, Philip Glick, vice president of Graham, sent a copy of Equity's PPM to Duane Morris for review, specifically requesting Donald Auten, a lawyer in the tax section,[4] to "review the contents of this Memorandum and provide us with your comments on the structure and adequacy of disclosure, the reasonableness of the tax position taken and the adequacy of the tax opinion relative to the tax discussion". Glick also welcomed "any other observations you [Auten] may have relative to the tax structure and legal disclosure in relation to other projects you may have seen".

Auten prepared a 15 page memorandum (Duane Memo); he stated in his deposition that he was singularly responsible for its contents, and that he based his analysis solely on his review of the PPM.[5] The Duane Memo began by stating that "[o]ur overall reaction to the adequacy of the disclosure in the PPM from a securities standpoint is that the PPM would appear deficient in several material respects and should be supplemented". Among the items mentioned were (1) the absence of discussion and analysis relating to the prior history of the project;[6] (2) troublesome tax issues arising from an appraisal showing a fair market value ($12,700,000) in excess of the arm's length purchase price ($10,249,250); (3) inconsistent calculations of expected proceeds upon sale of the project in 1992 or 1994; (4) the risks to the investors and to Home of a procedure allowing the partnership to hold an interim closing, providing that Equity purchase any remaining Units (up to 146)

---

[4]Auten testified that he did not "pretend to be a "securities lawyer' "; but he was "familiar in a general way with Rule 10(b)(5)".

[5]According to Auten, his engagement "was simply to take this red book [the PPM] and read it from one end to the other".

[6]The Duane Memo opined that this was "[p]erhaps the most serious omission in the PPM from a securities standpoint" and recommended that "[a]t a minimum, the adverse prior history should be discussed and analyzed in the text of the PPM".

on the final closing date;[7] (5) the failure to explicitly disclose the true effective interest rate (17%) with respect to the new money under the wraparound mortgage;[8] and (6) the need to include an exculpatory statement in the PPM precluding the investors' reliance on Home in making their investment decisions.

In September 1984, Glick (Graham) wrote a letter to Equity regarding changes to the PPM. He included several suggestions set forth in the Duane Memo, including the need to insert disclaimer language in the PPM and surety related documents. Shortly thereafter, Glick wrote a follow-up letter to Equity and attached a copy of the Duane Memo, noting that "this Memorandum highlights some additional technical corrections which we feel should be made in the Equity Group Offering Memorandum from a specific tax and securities disclosure standpoint". Glick requested Equity's "cooperation with us in including these changes in the supplement", and related that,

> [f]rom past experience we have found that obtaining another viewpoint on our clients' Memorandums has often resulted in some worthwhile improvement, both from a legal and marketing standpoint. I hope these comments will be helpful to you and that they will provide additional comfort to the Home Insurance Company in conjunction with the issuance of its bond.

The first supplement to the PPM was released on November 21, 1984. It incorporated

---

[7]The Duane Memo stated that "[t]his procedure creates a serious risk to the investors as well as to the Surety". It explained:

> Because the offering may close and the Project may be purchased with far fewer than 146 Units having been sold, if the Managing General Partner were to become financially embarrassed between October 1, 1984, and January 24, 1985 [final closing], the investors and Surety could be left in an unacceptable position.

Thus, it recommended a change in procedure:

> [I]f closing on the project takes place before the minimum of 146 Units are sold, the Managing General Partner is required to put funds in escrow (or furnish an irrevocable letter of credit) to guarantee that on January 24, 1985, the Managing General Partner will be able to satisfy its obligation to purchase the remaining Units.

It added that "[t]he existing procedure completely undermines that concept of requiring a minimum number of Units to be sold before closing can take place".

[8]The Memo opined: "If an investor were told this fact (instead of having to make the calculations for himself), his view of the economic risks of the investment might change. Once again, however, this potentially unfavorable information is effectively buried in the PPM".

disclaimer language providing that Home and Graham "have not made any investigation ... as to the merits ... and make no representation nor express any opinion with respect thereto, ...", along with an explicit acknowledgement that investment decisions were made without reliance on the surety (Home) or its agent (Graham). In addition, the supplement emphasized the investors' unconditional obligation to Home under the indemnity agreement. It did not, however, incorporate a number of the other changes suggested in the Duane Memo.

During the latter part of 1984, 40 of the Courtside units remained unsold, with the offering period scheduled to end on January 24, 1985. Four Louisiana general partnerships (E-C One, E-C Two, E-C Three and E-C Four) were formed to purchase the unsold units. Hibernia loaned the funds to each E-C partnership, requiring the Equity principals to become E-C partners and requiring each non-Equity partner in the E-C partnerships to execute a solidary continuing guarantee of the entire Hibernia loan. Home agreed to act as surety for the Hibernia loan. The formation of the E-C partnerships was disclosed in the second supplement to the PPM, issued on January 18, 1985.[9]

Subsequent to the expiration of the offering on January 24, 1985, Courtside experienced financial problems and ultimately declared bankruptcy. Because Courtside failed to meet its financial obligations, the banks called the investors' notes. The investors (limited partners) defaulted, thus obligating Home to make payments under the terms of each bond. Home, in turn, looked to the investors for a full accounting, pursuant to the indemnity agreements.

In September 1986, over 40 Courtside investors brought suit against, *inter alia,* Equity, Home, and Graham. The complaint was amended several times, resulting in a third supplemental and

---

[9]The second supplement provided in part:

> Under the terms of the Memorandum, the Managing General Partner must purchase on January 24, 1985 all unsold Units up to the minimum offering amount (146 Units). In order to purchase such Units, it is anticipated that Affiliates of the Managing General Partner will form four general partnerships to purchase the unsold Units which are anticipated to aggregate 40. These general partnerships will be formed specifically to purchase 10 Units each in the Partnership. It is anticipated that Hibernia will lend to each of the general partnerships sufficient funds to enable the general partnerships to pay the cash portion of the purchase price of the Units plus the first three year installments under the First and Second Installment Notes. Thereafter, the general partnership will be required to pay the installments due on the First and Second Installment Notes.

amended complaint filed in March 1987.  The investors made claims under, *inter alia,* violations of §§ 12(2) and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (1933 Act);  §§ 20(a) and 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (1934 Act), along with Rule 10b-5;  the Louisiana Blue Sky Law, La.Rev.Stat.Ann. § 51:701 *et seq.;*  and state law (Louisiana) for fraud and negligent misrepresentation.  They sought damages and rescission.  Home counterclaimed for enforcement of the indemnity agreements.[10]

As noted earlier, the suits were based on the contention that Equity induced plaintiffs' investments through misrepresentations and omissions in the PPM, and misleading oral presentations. Specifically, they maintained that Equity, *inter alia,* misrepresented its financial health;  the condition, location, occupancy, tenancy and fair market value of the property;  and the soundness of the investment (*i.e.* "virtually risk free").

After over four years of discovery and pre-trial motions, Equity, as well as other defendants, announced settlement.  (All defendants ultimately settled, except for the Gerald Teel Company, Hibernia, Home, and Graham.)  That day, the court granted judgment on Home and Graham's motion to reconsider its earlier denial of summary judgment on the remaining issues,[11] thereby disposing of plaintiffs' case and granting Home's claims for enforcement of the indemnity agreements.  The court issued written reasons approximately four months later (January 1990).

Over the next two years, the parties disputed issues of costs, interest, attorney's fees, and amounts due Home.  Therefore, final judgment was not entered until January 1992.  Ten days later, plaintiffs moved for a new trial.  Upon denying plaintiffs' motions to file a supplemental memorandum raising a new theory of liability, and for reconsideration of same, the court denied plaintiffs' motion

---

[10]Separate actions by two other groups of investors, along with a separate action by Home, were consolidated with the original action.

[11]The motion sought reconsideration of the denial of judgment as to the state law negligence claim, as well as to resolve legal issues regarding the enforceability of the indemnity agreements. The court had previously granted judgment for Home and Graham on the remainder of plaintiffs' claims.

for a new trial.  Since then, all but five of the plaintiffs have settled.[12]

## II.

Appellants challenge the district court's disposition of the summary judgment motions, and also assert error based on the court's post-judgment rulings.

### A. Summary Judgment

We review a summary judgment *de novo.  E.g., Degan v. Ford Motor Co.,* 869 F.2d 889, 892 (5th Cir.1989).  It may be granted if there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law".  Fed.R.Civ.P. 56(c).  "[T]he substantive law will identify which facts are material".  *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The movant has the initial burden of demonstrating the absence of material fact issues. *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).  To avoid summary judgment, the nonmovant must adduce evidence which creates a material fact issue concerning each of the essential elements of its case for which it will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).  "[A] dispute about a material fact is "genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party".  *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.  We resolve all factual inferences in favor of the nonmovant.  *Degan,* 869 F.2d at 892.  Needless to say, unsubstantiated assertions are not competent summary judgment evidence.  *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553.

### 1. Controlling Person

Sections 15 of the 1933 Act[13] and 20 of the 1934 Act[14] impose liability on "controlling

---

[12]The appellants are:  (1) D.L. Bradke;  (2) Eugene M. Parrish;  (3) David Sibley;  (4) Louis R. Koerner;  and (5) Elizabeth Turnbull.

[13]Under the 1933 Act:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections [11 or 12], shall also be liable jointly and severally

persons" for securities violations committed by those under their control. Appellants maintain that material fact issues remain concerning Home and Graham's liability as "controlling persons". As discussed *infra,* we have no ruling by the district court of an underlying securities violation and thus assume a violation for purposes of our analysis.

The parties disagree on the elements for a *prima facie* case under §§ 15 and 20.[15] Specifically, appellants take issue with Home and Graham's assertion, based on *G.A. Thompson & Co., Inc. v. Partridge,* 636 F.2d 945 (5th Cir.1981), and *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 949 (7th Cir.1989), that this circuit has adopted the two part test of *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985), *cert. denied, Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986).

In *Thompson,* our court held that an officer and director, who owned 247 of the company, and was apparently involved in the day-to-day coordination of loan gathering,[16] had the "requisite power to directly or indirectly control or influence corporate policy", and, thus, was a controlling party. 636 F.2d at 958. In so doing, our court rejected the contention that actual participation in the

---

> with and to the same extent as such controlled person to any person to whom such controlled person is liable....

15 U.S.C. § 77*o*.

[14]The 1934 Act states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable....

15 U.S.C. § 78*t* (a).

[15]The control person sections of both acts are interpreted the same, at least with respect to the definition of "controlling person", *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 958 & n. 22 (5th Cir.1981).

> The term "control' ... means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 230.405(f) (quoted in *Id.* at 957-58).

[16]The corporation marketed mortgage loans. *Id.* at 949.

transaction underlying the violation was a prerequisite for a *prima facie* case, noting that "[l]ack of participation and good faith constitute an affirmative defense". *Id.* At the same time, it noted that our precedent was "ambiguous on whether "effective day-to-day control' is required", and, without deciding the issue, noted that the evidence established sufficient day-to-day control. *Id.* at 958 n. 24.

In *Metge,* the Eighth Circuit subsequently established a two-prong test for a *prima facie* case for controlling person liability: (1) "that the defendant [ ] actually participated in (*i.e. exercised* control over) the operations of the corporation in general"; and (2) "that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but [plaintiff] need not prove that this later power was exercised". 762 F.2d at 631 (internal quotations omitted) (emphasis in original).[17] The court cited *Thompson* only as support for its rejection of a " "culpable participation' requirement, which requires a showing that [the defendant] actually participated in the alleged violation". *Id.* at 631.

It is clear that *Thompson* did not definitively address prong one of the *Metge* test, *i.e.* a required showing that the defendant exercised control over the general operations of the wrongdoer; nor did it adopt the two prong *Metge* test, as urged by appellees in reliance on the Seventh Circuit's opinion in *Schlifke,* 866 F.2d at 949; and, conversely, *Metge* did not cite *Thompson* as support for its formulation of prong one (only, as stated *supra,* as support for prong two).

Thus, the law is somewhat more unsettled as to prong one than Home and Graham would have it. Our decision in *Dennis v. General Imaging, Inc.,* 918 F.2d 496 (5th Cir.1990), however, provides some guidance on that narrow ground. There we adopted a district court opinion, which interpreted *Thompson* as requiring a plaintiff, for a *prima facie* case, to show "actual power or influence over the controlled person".[18] *Id.* at 509.

---

[17]The court found that evidence of, *inter alia,* a lender's 187 ownership of the borrower's stock, and proxy on a controlling interest of the borrower's subsidiary, did not establish actual control over the operations of the corporation in general; but, at most, demonstrated the potential for influence over some business decisions. *Id.* at 631-32.

[18]We note that *Dennis* does not accurately reflect our rejection in *Thompson* of a "culpable participation" requirement. 918 F.2d at 509. We need not resolve this inconsistency, because our holding turns on appellants' failure to establish Home and Graham's power to control Equity.

*Dennis* is consistent with *Metge* to the extent that both require a separate showing of control over the controlled entity (Equity); but appellants insist that our circuit only requires that they show Home and Graham's *power* to control Equity, *not the actual exercise* of that power. We need not presently analyze the above distinction because, even assuming that only the former applies, a reasonable jury could not so find based on the record before us.

According to the affidavits of John MacGregor (assistant vice president of Home), and Glick (Graham), neither Home nor Graham nor their respective employees and representatives were stockholders, directors, officers, employees, or partners of Equity; they did not attend its board or committee meetings; they were not involved in decisions by Equity to purchase properties for syndications to investors; they were not involved in operations of properties purchased by Equity or its affiliates; and they were not otherwise involved in the general operations of Equity, including business, financial and marketing plans.

Appellants fail to contradict these statements with evidence of Home and Graham's power to control the general affairs of Equity. Graham's involvement with the issuance of financial guarantee bonds for other Equity projects,[19] and correspondence reflecting that Equity kept Graham informed of the status of the Courtside offering, as well as others, does not indicate that Graham had such power, even assuming its participation in such discussions.

Appellants' remaining evidence is less persuasive, as it narrowly relates to Home and Graham's involvement in the Courtside transaction.[20] Although appellants make much of Home and Graham's influence over the formation of the E-C partnerships, *see infra,* and the statement in an internal Graham memo (dated March 6, 1986) from Thomas Pine to Glick that, "[w]ithout Home, Courtside wouldn't have been done", this evidence is not probative of Home and Graham's influence beyond the Courtside transaction. Accordingly, summary judgment on this claim was proper.

---

[19]Glick testified that he had reviewed roughly a dozen PPM's for other Equity projects in his capacity as agent or broker.

[20]Appellants point to Home and Graham's influence over the execution and contents of certain financing documents; their request to approve documents relating to the transaction, including the PPM (which contained exculpatory language requested by Home); and memoranda from Glick to Equity, discussed *supra,* regarding suggested changes to the PPM.

## 2. Aider and Abettor

Appellants maintain that fact issues remain concerning Home and Graham's liability under § 10(b) of the 1934 Act[21] and Rule 10b-5.[22] Those who aid and abet securities fraud are subject to Rule 10b-5 liability; but, we have emphasized recently that this "added layer of liability ... is particularly problematic.... We should be exacting in determining whether aider and abettor liability can be demonstrated". *Akin v. Q-L Invest., Inc.,* 959 F.2d 521, 525 (5th Cir.1992).

To establish liability, the plaintiff must show (1) that the primary party committed a securities violation; (2) that the aider and abettor had "general awareness" of its role in the violation; and (3) that the aider and abettor knowingly rendered "substantial assistance" in furtherance of it. *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1126 (5th Cir.1988) (internal quotations omitted), *vacated, Fryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989).[23]

---

[21]Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national security exchange—
>
> > (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance....

15 U.S.C. § 78j(b).

[22]Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly ...
>
> (a) to employ any device, scheme, or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1992).

[23]Although *Abell* has been vacated, it remains authoritative on the non-RICO issues. *First Nat. Bank of Commerce v. Monco Agency, Inc.,* 911 F.2d 1053, 1061 n. 15 (5th Cir.1990).

For the first element, we again assume underlying securities fraud. *See* notes 27 and 28, *infra*. Underlying the other two elements—"general awareness" and "knowing substantial assistance"—is a single scienter requirement that varies on a sliding scale from "recklessness" to "conscious intent". *Abell,* 858 F.2d at 1126-27. The plaintiff must show conscious intent, unless there is some special duty of disclosure, or evidence that the assistance to the violator was unusual in character and degree. *Akin,* 959 F.2d at 526, 531.[24] In the latter two instances, a recklessness standard applies.[25] *Id.*

Throughout the district court proceedings, appellants maintained that Equity violated § 10 and Rule 10b-5 by inducing appellants to invest in Courtside through oral and written misrepresentations.[26] Their aiding and abetting allegations were based on Home and Graham's continued participation in the Courtside transaction despite their receipt of the Duane Memo, which, according to appellants, provided a blueprint of Equity's fraud.

The district court concluded that the summary judgment record lacked probative evidence of Home and Graham's "substantial assistance" in the alleged violations,[27] relying primarily on its findings that they did not owe appellants a duty of disclosure, and that the activities described were

---

[24]This court has often reiterated that, "[i]f the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b-5 liability without clear proof of intent to violate the securities law". *See, e.g., Abell,* 858 F.2d at 1126 (*quoting Woodward v. Metro Bank,* 522 F.2d 84, 97 (5th Cir.1975)).

[25]Our court defined "recklessness" in *Broad v. Rockwell International Corp.,* 642 F.2d 929, 961-62 (5th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981):

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

As noted in *Akin,* 959 F.2d at 526 n. 2, although we used the modifier "severe", our definition of recklessness is the same as applied by other circuits.

[26]As discussed *infra,* subsequent to final judgment, appellants attempted to recharacterize the primary violation (adding Rule 10b-9).

[27]Contrary to appellants' assertions, the district court did not find genuine issues of material fact concerning the existence of a primary securities violation; rather, noting appellants' settlement with Equity, it merely assumed so to abbreviate its analysis.

simply "grist of the mill". We agree, and stress that appellants also failed to meet the scienter requirement underlying the latter two elements of the *prima facie* case.[28]

First, we address appellants' assertion that Home and Graham had a duty to disclose the contents of the Duane Memo. They urge, *inter alia,* that this duty of disclosure arises from Home's status as their surety. Home and Graham counter by stating that generally, a surety has no legal duty of disclosure. As our court noted in *Akin,* the "theory" of liability based on a special duty of disclosure is "mushy and difficult to apply", as the source and scope of such a duty is not based on any textual provision of the securities laws, but "appears to be a specie of federal common law". 959 F.2d at 526. We thus refrain from specifically defining the disclosure obligations of a surety and its agent; rather, applying relevant factors annunciated by our court in *First Virginia Bankshares v. Benson,* 559 F.2d 1307 (5th Cir.1977), *cert. denied, Walter E. Heller & Co. v. First Virginia Bankshares,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978), and applied by other circuits, see *Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1330 (8th Cir.1991), *cert. denied Reves v. Ernst & Young,* --- U.S. ----, 112 S.Ct. 1165, 117 L.Ed.2d 411 (1992); *Jett v. Sunderman,* 840 F.2d 1487, 1493 (9th Cir.1988); *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987),[29] we conclude that Home and Graham did not have such a duty.

We first examine the parties "relative access to the information to be disclosed". *First Virginia Bankshares,* 559 F.2d at 1314. To be sure, the summary judgment record reflects that Home and Graham were privy to additional information due to their involvement with the issuance of the bonds, and from Graham's prior dealings with Equity; however, as stated, the standard is "relative access to the information *to be disclosed* ". *Id.* (emphasis added). Because appellants

---

[28]As stated, we also assume that fact issues remain concerning Equity's violation of Rule 10b-5. Home and Graham did not challenge appellants' evidence on this element (except with respect to those who allegedly failed to read the PPM); and, as discussed, we do not have the benefit of a district court ruling.

[29]Of course, *First Virginia Bankshares* is also precedent for the Eleventh Circuit, because it was decided before October 1, 1981. *See Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

neglect to demonstrate that such access supplied Home and Graham with superior knowledge of the allegedly misleading aspects of the PPM,[30] this factor does not weigh in their favor.[31]

We next examine the benefit derived from the sale of securities. Home and Graham received a premium of $257,060 for bonding a risk of almost $5 million. Given the risk of loss, this factor only slightly supports a duty to disclose.

As for the third factor, "the defendant's awareness o f plaintiff's reliance on defendant in making its investment decisions", *id.,* appellants once again misconstrue their burden. They must set forth evidence that they *relied on* Home and Graham in making their investment decisions, not that they relied on misrepresentations in the PPM. There is no evidence that potential investors viewed Home and Graham's involvement as approval of the merits of the investment, or otherwise relied on Home and Graham, much less evidence that Home and Graham were "generally aware" of such reliance. Rather, Home's identity as surety was not revealed until the first supplement to the PPM, which also contained a disclaimer specifically included to prevent such reliance.[32] Needless to say, this factor does not support a duty to disclose.

---

[30]By contrast, Glick stated by affidavit:

> None of the information that affiant received from the Equity Group or its securities counsel during the course of his activities described herein, whether oral or written, and whether received prior or subsequent to affiant's receipt of the PPM, in any way contradicted any of the information in the PPM.

[31]The Duane Memo lacks probative value, as it was based solely on the PPM, *see supra,* which was received by each appellant.

[32]The supplement stated:

> THE SURETY AND ITS AGENT HAVE NOT MADE ANY INVESTIGATION OR DETERMINATION AS TO THE MERITS, OR RISKS, FINANCIAL OR OTHERWISE, OF THE LIMITED PARTNERSHIP INVESTMENT AND MAKE NO REPRESENTATION NOR EXPRESS ANY OPINION WITH RESPECT THERETO,....
>
> IN EXECUTING THE INVESTOR APPLICATION, EACH INVESTOR ACKNOWLEDGES THAT SUCH INVESTOR HAS INDEPENDENTLY, AND WITHOUT RELIANCE ON THE SURETY, MADE SUCH INVESTIGATION AND INQUIRIES AS THE INVESTOR DEEMED NECESSARY AND PRUDENT TO REACH A REASONABLE INVESTMENT DECISION WITH RESPECT TO THE LIMITED PARTNERSHIP INVESTMENT.

Finally, we can quickly dispose of the fourth factor, "the defendant's role in initiating the purchase or sale", *id.,* as it is undisputed that neither Home nor Graham had contact with investors regarding their investment decisions. In sum, we conclude from our analysis of the above factors that Home and Graham did not owe appellants a duty of disclosure.

Appellants next maintain that even if Home and Graham lacked a duty to disclose, their participation in the formation of the E-C partnerships constituted "substantial assistance", unusual in scope and degree; thus, they need not prove conscious intent, only recklessness. Once again, we disagree.

Although there is evidence that Home and Graham were included in discussions regarding the possible failure to fully subscribe Courtside by the closing date, we agree with the district court that there is no evidence that their role extended beyond that of a surety and bonding agent. Rather, the only evidence of involvement by Home and Graham was their refusal to bond the remaining 40 units under one partnership, and subsequent agreement to bond the units under four partnerships (the E-C partnerships); decisions central to their designated function. We thus consider the above assistance, even if substantial, see *Insurance Co. of North America v. Dealy,* 911 F.2d 1096, 1101 (5th Cir.1990) ("the routine extension of a loan does not amount to substantial assistance"), to be merely "grist of the mill".[33]

---

[33]The remainder of appellants' evidence on this issue is equally deficient. Namely, they urge that a reasonable jury could conclude that Home and Graham's activities were not simply "grist of the mill" in view of Graham's prior involvement with Equity, and the earlier discussed 1985 internal memorandum from Graham's Pine to Glick stating, *inter alia,* "Reaction to The Home Insurance Company—positives & negatives compared to A.I.G. etc. Anything that he doesn't like? Without Home, Courtside wouldn't have been done".

As for the former, we conclude that the summary judgment evidence of Graham's involvement as bonding agent for other Equity projects, see *supra* note 19, does not create the inference of particularly substantial or unusual assistance. Our finding to the contrary in *Akin,* 959 F.2d at 531, is distinguishable. Suffice it to say, the scope and degree of involvement by the defendant/accountant in *Akin* was far greater than that before us.

As for the latter, the above-quoted statement is perhaps probative evidence of Home's substantial assistance, but it is not sufficient evidence from which a jury could conclude that such assistance was unusual. Interpreting the statement, Pine explained that Home was critical to the closing, and more helpful than A.I.G. (National Union Insurance Company) due to its ability to efficiently process the multitude of documents. Of course, contrary inferences are possible, including that urged by appellants; however, such an

Because appellants failed to establish either a duty of disclosure or atypical assistance, they must provide evidence of conscious intent, rather than recklessness. (In considering whether they meet this burden, we assume, without deciding, that Home and Graham's involvement constituted substantial assistance.) The reco rd is devoid of such evidence; thus, summary judgment is appropriate. *See, e.g., Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1449 (5th Cir.1993) (internal quotations omitted) ("Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue, ... if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").

With apparently good intentions, Graham forwarded the Duane Memo to Equity, and suggested that Equity incorporate its counsel's suggestions. Home and Graham's continued participation, despite Equity's failure to adopt some of the suggestions, does not signal their intent to further the fraudulent scheme.[34] As we stated in *Abell,* 858 F.2d at 1128, "[a]roused suspicions ... do not constitute actual awareness of one's role in a fraudulent scheme. Moreover, to prove plainly

---

inference is not sufficient to create a material fact issue.

[34]In fact, in addition to appellants' evidence not creating a material fact issue on conscious intent, we question whether it even establishes recklessness. Although the language in the Duane Memo alerts Home and Graham to deficiencies in the PPM, it does not imply that they were "highly unreasonable"; nor does correspondence between Glick and Equity indicate that it was so construed. Rather, Glick requested Equity's "cooperation" in adopting Duane Morris's suggestions, noting that "[f]rom past experience we have found that obtaining another viewpoint on our clients' Memorandums has often resulted in *some worthwhile improvement,* both from a legal and marketing standpoint". (Emphasis added.) Without expressing any opinion as to the merits of Duane Morris's assessment, or discomfort with the adequacy of the Duane Memo, Glick concluded: "I hope these comments will be helpful to you and that they will provide *additional comfort* to The Home Insurance Company in conjunction with the issuance of its bond". (Emphasis added.)

In addition, Glick testified that the supplemental PPM sufficiently addressed the concerns of Home and Graham. Finally, in late December, 1984, Home and Graham received an opinion letter from counsel for Courtside stating that

> [n]othing has come to our attention, after inquiry, which would lead us to believe that the Memorandum (except for the financial statements and other financial and statistical data and the projections included therein, as to which we do not express any belief), on the date of the Memorandum, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

that an alleged abettor intended to violate the securities laws, plaintiffs must prove more than that the abettor recklessly ignored danger signals".

Likewise, Home and Graham's receipt of a reasonable premium for participation in the transaction does not supply a motive. We agree with the Second Circuit that "almost any entity playing a role in a securities transaction will have some economic motivation for doing so". *National Union Fire Insurance Co. v. Turtur,* 892 F.2d 199, 207 (2nd Cir.1989).[35]

In sum, in view of the lack of evidence of intent, the district court properly disposed of appellants' aiding and abetting claim.[36]

### 3. Fraud and Negligent Misrepresentation

Appellants maintain Home and Graham's failure to disclose misrepresentations and material omissions in the PPM, brought to their attention through the Duane Memo, constitutes negligent misrepresentation under Louisiana law.[37] To prevail, Louisiana requires proof of actual reliance. *Abell,* 858 F.2d at 1131 (applying Louisiana law).[38] Upon reviewing the summary judgment record, we agree with the district court that there is no evidence of reliance on those aspects of the PPM specifically discussed in the Duane Memo.[39]

---

[35]Appellants also point to Home and Graham's motive to close the deal once involved as surety; however, because appellants did not contend in the district court that the formation of the E-C partnerships was fraudulent, or that Home and Graham had knowledge of same, this motive, standing alone, carries little weight.

[36]Appellants' claims under the Louisiana Blue Sky Law were also properly dismissed, because it is undisputed that Home and Graham were not sellers of securities as defined by § 12(2) of the 1933 Act. *Abell,* 858 F.2d at 1130-31.

[37]It is undisputed that Louisiana law applies in this diversity case. Except as to the issue of duty, discussed *infra,* appellants waived their fraud claim by failing to properly brief the issue. *See infra* note 50.

[38]Negligent misrepresentation is encompassed within the broad language of articles 2315 and 2316 of the Louisiana Civil Code. *Devore v. Hobart Mfg. Co.,* 367 So.2d 836, 839 (La.1979). In order to recover, the plaintiff must show (1) a legal duty to supply correct information; (2) breach; and (3) damages resulting from justifiable reliance on the misrepresentation. *Commercial Nat. Bank v. Audubon Meadow Part.,* 566 So.2d 1136, 1139 (La.App. 2d Cir.1990).

[39]Of the five appellants: (1) *Koerner* could not recall reading the PPM and provided no pertinent testimony regarding reliance; (2) *Parrish* possibly read parts of the PPM, but could not recall any specifics nor did he provide pertinent testimony as to factors influencing his investment decision; (3) *Sibley* skimmed the PPM, "not really" relying on its contents but instead relying on

In fact, on appeal, appellants do not challenge the court's finding on reliance;[40] rather, for both fraud and negligent misrepresentation, they focus solely on the erroneous proposition that duty of care is a complex issue of fact not suitable for summary judgment. *See Commercial Nat. Bank,* 566 So.2d at 1140 (stating that the existence of a duty is a question of law); *see also Hibernia Nat. Bank v. Carner,* 997 F.2d 94, 98 (5th Cir.1993) ("it is insufficient for the nonmovant to argue in the abstract that the legal theory involved in the case encompasses factual questions"). Needless to say, this assertion of error is wholly without merit.

### 4. Indemnity Agreements

Appellants maintain that fact issues remain concerning the enforceability of their indemnity agreements.[41] Relying on *National Union Fire Insurance Co. v. Turtur,* 892 F.2d 199 (2d Cir.1989),[42] they urge that where a surety receives an indemnity agreement from the investor in return

oral representations that the project was "low risk" and catered to professionals (which are both inconsistent with the PPM); and (4) *Turnbull* did not read the PPM, and in fact would not have invested had she done so; instead, she relied on her accountant who focused on tax projections; although he read the PPM, there is no evidence of actual reliance on specific misrepresentations or material omissions in it, except for references to the stated fair market value contained in Teel's appraisal, which is irrelevant given the district court's conclusion (in support of summary judgment for Teel) that appellants failed to show that the appraisal was misleading.

> Of course, Home and Graham are not responsible for oral misrepresentations inconsistent with, or not pertinent to, aspects of the PPM discussed in the Duane Memo, as appellants' action against them is based on appellees' failure to correct or otherwise disclose misleading information referenced in the Duane Memo, and their continued participation in the Courtside transaction despite their knowledge of same.

[40]In their motion for summary judgment, Home and Graham specifically pointed to appellants' failure to allege actual reliance in support of the state law claims of fraud and negligent misrepresentation. In response, appellants failed to point to specific evidence of reliance; nor did they do so in their motion for a new trial, despite the district court's finding. And, as stated, they fail to assert error on appeal. As a result, our review of the record is without assistance from those with the burden of proof.

[41]As stated *supra,* the investors sought rescission of the agreements; Home counterclaimed for their enforcement. The district court granted summary judgment in favor of Home on the rescission action and subsequently granted it on Home's counterclaim. On appeal, appellants focus on the latter.

[42]In *Turtur,* National Union issued a bond in exchange for the investor's execution of an indemnification agreement, which was attached to the PPM. The Second Circuit held that, if the indemnification agreement and the subscription agreement are considered under New York law as *interdependent,* "a fraudulent inducement as to one of the contracts *might* [ ], in at least some situations, excuse performance by the defrauded party of the other contract". *Id.* at 204

for bonding the investor's obligations, and the separate subscription and indemnity agreements are executed contemporaneously, fraudulent inducement in the subscription agreement renders the indemnity agreement likewise fraudulently induced and thus unenforceable. Finding no basis for the foregoing proposition under federal or Louisiana law,[43] we reject it.

In *Dealy,* we held that an indemnity agreement is unenforceable due to fraud in the subscription agreement where the surety was "a party to the fraud [as an aider or abettor] or a coconspirator in it". 911 F.2d at 1100.[44] We thus apply the reasoning of *Dealy,* and conclude that because appellants have failed to produce more than a scintilla of evidence of Home and Graham's involvement in the alleged fraud, *see supra,* federal law does not provide a defense.

Our analysis of Louisiana law produces the same result. Even if we construe the indemnity and subscription agreements as interdependent,[45] we conclude that appellants, at a minimum, must meet the requirements of La.Civ.Code.Ann. art 1956, which provides: "Fraud committed by a third person vitiates the consent of a contracting party if the other party knew or should have known of the fraud".[46] *Cf. Breaux v. Equity Group,* 1989 WL 1764 *2, 1989 U.S.Dist. LEXIS 235 *5

---

(emphasis added). The Second Circuit reversed the grant of summary judgment because fact issues remained on the interdependency *vel non* of the agreements. *Id.* at 205.

[43]It has been agreed in the district court and on appeal that the indemnity agreements should be construed under Louisiana law.

[44]There, an investment bond insurer brought suit against the insured, an investor in a limited partnership. Like the case at bar, the investor paid partly in cash and partly in the form of a promissory note payable to the partnership. The partnership in turn secured a loan with the investor's note, which the surety bonded in return for an indemnity agreement executed by the investor. Subsequent to the investor's default, the surety brought suit against the investor to enforce the indemnity agreement. In defense, the investor asserted that the indemnification agreements were contracts related to a securities fraud and thus unenforceable. *Id.* at 1098, 1100.

[45]We emphasize that we are assuming, for purposes of our discussion, that the agreements should be considered interdependent under Louisiana law. *Compare General Ins. Co. v. Fort Lauderdale Partnership,* 740 F.Supp. 1483, 1488 (W.D.Wash.1990) (distinguishing *Turtur* and concluding, that, under Washington law, the indemnification agreement was independent).

[46]*Turtur* is not necessarily inconsistent. There the court concluded that appellants had raised a fact issue as to whether the bond insurer was "a party to any fraud or illegality affecting the [Notes]". 892 F.2d at 205; *see Bruce v. Martin,* 1993 WL 148904, ** 10, 11, 1993 U.S.Dist.LEXIS 5776, ** 32, 33 (S.D.N.Y. April 28, 1993) (restricting *Turtur* to "a situation where the fraud in the inducement of the subscription agreements ... was the same fraud to which

(E.D.La.1989).

To satisfy article 1956, appellants must not only show that a reasonable jury could find the requisite knowledge based on the Duane Memo (and subsequent insertion of exculpatory language in the PPM), but, also, that error resulting from the alleged misrepresentations and material omissions contained in the PPM, and referenced in the Duane Memo, "substantially influenced that consent". La.Civ.Code.Ann. art. 1955. Because the summary judgment record is lacking on evidence of reliance, *see supra* note 39, appellants' fraud defense fails. *See In re J.M.P.,* 528 So.2d 1002, 1010 (La.1988) (stating that to vitiate consent on the ground of fraud, "the party who asserts that the obligation is null must prove some type of causal relationship between his consent and the vice that influenced it").[47]

Appellants next assert that even if the indemnity agreement is independent, rather than interdependent, and thus unaffected by fraud in the inducement of the subscription agreement, it does not obligate them to indemnify Home. A contract of indemnity is construed in accordance with the general rules governing contract interpretation—"[w]hen the words of a contract are clear, *unambiguous,* and lead to no absurd consequences, the contract is interpreted by the court *as a matter of law.*" *Carter v. BRMAP,* 591 So.2d 1184, 1188 (La.App. 1st Cir.1991) (emphasis in original). "Agreements to indemnify are strictly construed and the party seeking to enforce such an agreement bears the burden of proof." *Liem v. Austin Power, Inc.,* 569 So.2d 601, 608 (La.App. 2d Cir.1990).

The indemnity agreement provides:

> The [investor] will protect, indemnify, and save harmless [Home] from and against any and all liability, loss, costs, damages, fees of attorneys, and other expenses which [Home] may sustain or incur under or in connection with the Bonds hereunder, or in connection with this Agreement, for:

the surety was alleged to be a party").

[47]We also reject appellants' attempt to nullify the indemnity agreement based on the "failure of cause". "Cause is the reason why a party obligates himself". La.Civ.Code.Ann. art. 1967. According to appellants, "[i]f the partnership agreement is extinguished by fraud, the cause for the indemnity contract no longer exists". This, of course, cannot be; otherwise, the validity of all such indemnity agreements would unconditionally hinge on the validity of the separate subscription agreement.

. . . . .

> (c) all demands, liabilities, losses, charges and expenses of every kind, which [Home] may become liable to pay or have paid by reason of or in consequence of the execution by [Home] of the Bonds in favor of the [investor].

The referenced bonds provide that "[a] default occurs regardless of whether the Principal for any reason shall have no legal obligation to discharge his, her or its obligations *under the Notes* to the *Obligee* or the *Permitted Assignee whichever holds the Note(s) which are guaranteed in part by the Surety* ". (Emphasis in original.) In the same paragraph, Home waives its defenses to payment.[48]

In view of this language, we conclude that the indemnity agreement encompasses fraud; however, even if we accept appellants' assertion that the contract is ambiguous and thus look outside the contract to discern the parties' intent, appellants nonetheless fail to create a material fact issue. The first supplement to the PPM evidences Home's intent that the indemnity agreement impose an unconditional obligation on the investors.[49] Appellants, on the other hand, did not adduce evidence demonstrating their intent. Accordingly, uncontradicted evidence establishes that the indemnity agreements do not provide a defense to enforceability. *See Carter,* 591 So.2d at 1192 (granting summary judgment where nonmovant failed to raise a genuine issue of material fact as to the contract's proper interpretation).

We summarily dismiss appellants remaining two bases for nullifying their obligations.[50] First,

---

[48]The bonds provide: "Surety waives for the benefit of the *Permitted Assignee* only all defenses of any kind either Surety or any Principal might have with respect to any or all Note(s) or the obligation to pay any or all Note(s) *up to the Sub-Limit of Liability applicable on each Note or the Limit of Liability as defined herein* ". (Emphasis in original.)

[49]It states:

> Because each investor's obligation to the Surety under the Indemnification and Security Agreement is unconditional, the result may be that the investor will be obligated to make payments to the Partnership or a financial institution even though it may have a claim against the lender of the Term Debt or the Partnership. The essence of the Financial Guarantee Bond is that each investor's obligation to make payments on the Installment Notes are absolute and may not be avoided or postponed for any reason.

[50]In addition, we refuse to consider those issues that were not raised in district court ("the abuse of rights doctrine"), or properly briefed on appeal (La.Civ.Code Ann. art. 1759 and 1772). *See Jernigan v. Collins,* 980 F.2d 292, 297 n. 1 (5th Cir.1992) (issues waived if presented for the first time on appeal), *cert. denied,* --- U.S. ----, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *United*

appellants' reliance on codal suretyship arguments is misplaced. They seek to nullify the indemnity agreements, not their obligation to Home arising from Home's issuance of the bonds.[51] As stated in *Commercial Union Ins. Co. v. Melikyan,* 430 So.2d 1217, 1221 (La.App. 1st Cir.1983), a contract on indemnity is different from a contract on suretyship:

> The contract of indemnity forms the law between the parties and must be interpreted according to its own terms and conditions.... [I]n an indemnity contract, the principal and indemnitors can be bound to the surety in any manner they elect in consideration of the surety issuing the bond covering the principal obligation.[52]

Second, we reject appellants' attempt to void the indemnity agreements pursuant to § 29(b) of the 1934 Act, 15 U.S.C. § 78cc(b).[53] The indemnity agreements, standing alone, were not made or performed in violation of the securities laws.[54] *See, Regional Properties, Inc.,* 678 F.2d at 561 n. 16.

In sum, appellants failed to establish a material fact issue regarding the enforceability of the indemnity agreements. Accordingly, in view of their plain meaning, we conclude, as a matter of law, that investors are obligated to Home, and thus affirm the summary judgment. In so doing, we complete our review of the summary judgment, and turn to appellants' contentions concerning the district court's post-judgment rulings.

### B. Post-Judgment Rulings

Appellants object to the rulings on their attempt to rely on a newly raised legal theory as a

---

*Paperworkers Int'l Union v. Champion Int'l Corp.,* 908 F.2d 1252, 1255 (5th Cir.1990) (same regarding issues raised for the first time in a reply brief).

[51]Pursuant to La.Civ.Code Ann. art. 3052, a surety who has paid the debt of a principal/debtor has a right of indemnification from the debtor, subject to certain restrictions.

[52]*See also Liem,* 569 So.2d at 608 (reiterating that the indemnity contract "forms the law between the parties," and noting that "[t]he purpose of an indemnity agreement is to allocate the risk inherent in the activity between the parties to the contract").

[53]Under § 29(b), an innocent party may avoid a contract if (1) the contract was made or performed in violation of the securities laws; (2) the plaintiff is in contractual privity with the defendant; and (3) the plaintiff is in the class of persons the statute was designed to protect. *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.,* 678 F.2d 552, 559 (5th Cir.1982).

[54]As stated *supra,* they maintain that the fraudulently induced subscription agreements rendered the indemnity agreements unenforceable.

basis for reconsideration of the summary judgment. Judgment was entered on January 31, 1992. Ten days later (February 10), appellants moved for a new trial (Fed.R.Civ.P. 59), reiterating arguments presented in their pre-judgment motions.

A month later (March 9), appellant-investor Turnbull enrolled new counsel, who, on March 27, filed a motion for leave to file a supplemental memorandum in support of the February 10 motion. The supporting memorandum, adopted by the other plaintiff-investors, asserted for the first time that Home and Graham had aided and abetted Equity in violation of Rule 10b-9, issued under § 10(b) of the 1934 Act.[55] The court denied the motion for leave to supplement, stating that "[t]he issues raised in this supplemental memo have never been presented before". Turnbull requested reconsideration.

On April 1, the parties argued the merits of the original (February 10) motion for a new trial. In addition, Turnbull urged that the court consider the Rule 10b-9 theory presented in the supplemental memorandum (which the court had not allowed to be filed), and gave a brief overview of the applicable law. The court agreed with Home and Graham that Rule 10b-9 had not been raised in six years of litigation, and thus refused to consider the new theory/issue. The court also denied the motion for a new trial.

---

[55]Rule 10b-9 states in pertinent part:

> It shall constitute a *manipulative or deception device or contrivance,* as used in section 10(b) of the Act, for any person, directly or indirectly, in connection with the offer or sale of any security, to make any representation:

. . . . .

> (2) to the effect that the security is being offered or sold on any other basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold, unless the security is part of an offering or distribution being made on the condition that all or a specified part of the consideration paid for such security will be promptly refunded to the purchaser unless (i) a specified number of units of the security are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date.

17 C.F.R. § 240.10b-9 (1992) (emphasis in original). "Once the part or none representation has been made, it may not be circumvented by transactions primarily designed to create the appearance of a successful offering in order to avoid the refund feature of the offering". *C.E. Carlson, Inc. v. S.E.C.,* 859 F.2d 1429, 1434 (10th Cir.1988).

Appellants do not dispute the district court's disposition of their motion for a new trial; rather, they object to its refusal to consider Turnbull's supplemental memorandum. For starters, they contend that simply by raising § 10(b) early on, they put in issue any and all rules adopted pursuant to it. Obviously, this contention is totally without merit. It goes without saying that, in order to be properly raised, an issue must be more specifically framed than as appellants claim. Otherwise, the court, not the parties, would be charged with deciding which claims should be pursued.

Appellants also use more specific approaches to attempt to save this new issue. "[A] trial court *may in the exercise of its sound discretion* allow a tardy amendment stating an additional ground for a new trial." *Dotson v. Clark Equipment Co.,* 805 F.2d 1225, 1228 (5th Cir.1986) (emphasis in original). The district court certainly did not abuse its discretion, considering the basis for the motion, the length of delay, and the lack of explanation for not having timely raised the issue.

First, we agree with the district court that the Rule 10b-9 theory is "new". (In fact, at the April 1 hearing, Turnbull's counsel admitted that a new theory was being presented: "I suggest that all the facts are before the Court, have been before the Court, and this is simply *another theory.*" (Emphasis added.)) As is apparent from Turnbull's post-judgment efforts and brief on appeal, appellants' theory requires the assertion of legal issues not previously raised;[56] the introduction of additional evidence;[57] and the analysis of a different law.[58]

---

[56]As appellants point out, Rule 10b-9 is often coterminous with Rule 10b-5; *see Carlson,* 859 F.2d at 1434 (stating Rule 10b-5 proscribes conduct violative of Rule 10b-9); however, the reverse is less often true. Here, for example, appellants' Rule 10b-5 theory was not based on misrepresentations surrounding the alleged "part-or-none offering". Accordingly, among the issues discussed at length by appellants for the first time were (1) whether Courtside was a part-or-none offering; (2) whether investor funds were used by Equity without first meeting the minimum offering amount; and (3) whether the minimum offering amount was reached through non-bona fide purchases.

Appellants' assertion that these arguments were raised previously is not supported by the record. Evidence of the formation of the E-C partnerships was used primarily to establish Home and Graham's involvement with Equity, not to establish that formation of those partnerships contravened the terms of the offering in violation of § 10 and Rule 10b-5.

[57]After the district court's refusal to reopen the case, Turnbull filed a motion requesting that her supplemental memorandum (with attached deposition excerpts and exhibits) be included in the record for appeal purposes, which the court denied, stating: "Mrs. Turnbull's request and her reasons for that request are in the record. That, the court permitted". Turnbull then filed a

The court was under no obligation to permit appellants to interject a new legal theory, without explanation, after they had failed to do so during three years of discovery, two additional years between the court's granting summary judgment and entering judgment, and almost two months following that entry. *See Allied Bank-West, N.A. v. Stein,* 996 F.2d 111, 115 (5th Cir.1993) (internal quotations omitted) ("[m]otions for new trial cannot be used to argue a case under a new legal theory"); *Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir.1990) (stating same with respect to a motion to alter or amend);[59] *see also Russ v. International Paper Co.,* 943 F.2d 589, 593 (5th Cir.1991) (denying Rule 59(e) motion for reconsideration because plaintiff did not explain his failure to submit evidentiary materials prior to judgment).[60] As stated, the district court did not abuse its discretion.

### III.

second motion to supplement the record with approximately 150 pages of deposition excerpts relating to her Rule 10b-9 theory. The court, referring to *Topalian v. Ehrman,* 954 F.2d 1125 (5th Cir.1992), again denied her attempt to include materials in the appellate record that were not before the district court, stating: "I think they don't belong here. I didn't consider them. There was a new issue that your client is attempting to inject in this record at this late date and I'm just going to not rule in your favor".

> Even if the court abused its discretion in refusing to allow Turnbull to supplement the record for appeal, any error is harmless, because our review is limited to the record before the district court when it ruled. *See Topalian,* 954 F.2d at 1131-32 n. 10 ("This court's inquiry is limited to the summary judgment record before the trial court: the parties cannot add exhibits, depositions, or affidavits to support their positions on appeal."). For the same reason, we refuse to consider that evidence as it appears in Turnbull's record excerpts.

[58]In fact, this circuit has not yet determined whether Rule 10b-9 provides a private cause of action, and, if so, whether that encompasses a claim based on allegations of aiding and abetting. *See Bormann v. Applied Vision Systems, Inc.,* 800 F.Supp. 800, 806 (D.Minn.1992) (concluding private action exists under Rule 10b-9); *accord Beaumont v. American Can Co.,* 797 F.2d 79, 84 (2d Cir.1986) (questioning existence of private remedy for violations of Rules 10b-6 and 10b-13).

[59]Of course, in keeping with the district court's "considerable discretion" in deciding whether to reopen a case, we do not read these cases to imply that it lacks discretion to consider a new legal theory on a post-judgment motion. *See United States use of American Bank v. C.I.T. Const., Inc.,* 944 F.2d 253, 259 n. 8 (5th Cir.1991) ("district court possesses the discretion to consider a claim raised for the first time in a posttrial motion").

[60]It follows that the court did not abuse its discretion by refusing to review the merits of the supplemental memorandum. Once the court considered the above factors, it was under no obligation to do so.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.