**Lane McNAMARA, et al., Plaintiffs,**

v.

**BRE–X MINERALS LTD.,
et al., Defendants.**

**No. 5–97CV–159.**

United States District Court,
E.D. Texas,
Texarkana Division.

March 18, 1999.

H. Lee Godfrey, Susman Godfrey LLP, Houston, TX, Damon Young, Young & Pickett, Texarkana, TX, for Lane McNamara.

H. Lee Godfrey, Susman Godfrey LLP, Houston, TX, A. Paul Miller, Miller James Miller Wyly & Hornsby, Texarkana, TX, R. Paul Yetter, Yetter & Warden, Houston, TX, Damon Young, Young & Pickett, Texarkana, TX, for Reuven Randall Singer.

H. Lee Godfrey, Susman Godfrey LLP, Houston, TX, A. Paul Miller, Miller James Miller Wyly & Hornsby, Texarkana, TX, R. Paul Yetter, Yetter & Warden, Houston, TX, Damon Young, Young & Pickett, Texarkana, TX, for all Plaintiffs.

T. Richard Handler, Jenkens & Gilchrist, Dallas, TX, for John B. Felderhof.

Robert E. Dodson, Gooding & Dodson, Texarkana, TX, Glen Carter Hudspeth, Texarkana, TX, for John B. Thorpe.

Karen Patton Seymour, Tiffany M. Erwin, D. Stuart Meiklejohn, Sharon Nelles, Sullivan & Cromwell, New York, NY, Preston Worley McGee, Tyler, TX, for Rolando C. Francisco.

Gary D. Grimes, David Gibson Paul, Grimes & Paul, Texarkana, TX, for Hugh C. Lyons.

Johnny Paul Arnold, Texarkana, TX, for Paul M. Kavanaugh.

David J. Beck, Lavalin Group, Inc., Beck Redden & Secrest LLP, Houston, TX, Paul E Summit, Sullivan & Worcester, Boston, MA, for SNC-Lavalin Group, Inc.

## ORDER

FOLSOM, District Judge.

Several Defendants in this action have filed motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). After considering the arguments of the parties, the Court finds that these motions are not well taken.

## I. BACKGROUND

This is a securities fraud case. Seeking class certification, the named Plaintiffs are persons who purchased common stock of Bre–X Minerals Ltd. ("Bre–X") and/or Bresea Resources Ltd. ("Bresea") between January 17, 1994 and May 2, 1997. The Plaintiffs essentially allege that the Defendants made misrepresentations that inflated the value of these stocks.

The Plaintiffs have brought four causes of action against the Defendants: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (found at 15 U.S.C. § 78j(b)) and Rule 10(b)–5 promulgated thereunder (found at 17 C.F.R. § 240.10b–5); (2) violations of § 20(a) of the Exchange Act (brought only against certain Defendants); (3) negligent misrepresentation; and (4) common law fraud.

### A. Bre–X

The central player in this action is Defendant Bre–X, a publicly traded mineral exploration corporation headquartered in Calgary, Alberta, Canada. Bre–X common stock was traded on the Alberta Stock Exchange at all times during the purported class period. The stock was traded on the Toronto Stock Exchange beginning April 23, 1996, and on the NASDAQ National Market beginning August 19, 1996. Bre–X has not contested personal jurisdiction.

In 1993, Bre–X acquired mineral rights in the Busang area of the East Kalimantan province of Indonesia. The Plaintiffs allege that during the purported class period, Bre–X and other Defendants misled stockholders and the public by falsely announcing increasingly larger estimates of a gold resource that it had discovered in the Busang area through exploratory drilling. In particular, the Plaintiffs accuse Bre–X of numerous misstatements in estimating the amount of gold at this site from 3 million ounces in 1994 to 200 million ounces in the spring of 1997.

The increasing gold estimates allegedly allowed Bre–X and Bresea stock to sell at artificially inflated prices. Things went downhill, however, in March 1997, when an independent mining consultant concluded that the prior estimates concerning the quantity of gold at Busang had been overstated because of invalid samples and improper testing of the samples. Stock prices began to fall, and Bre–X is now in bankruptcy.

### B. Bresea

Defendant Bresea is a Canadian holding company which owns (or at least owned at one time) approximately 23 percent of Bre–X. Bresea maintains no place of business or office in the United States. Furthermore, it has no employees agents, real estate, phone listings, mail boxes, or bank accounts in the United States.

### C. Insider Defendants

In addition to Bre–X and Bresea, the Plaintiffs have named fifteen other Defendants.[1] Eight of them are individuals who were Bre–X and Bresea officers and/or directors ("Insider Defendants"). These individuals and their respective positions are as follows:

**John B. Felderhof:**[2] Senior vice president, chief geologist, vice chairman of the board of directors of Bre–X; director of Bresea;

**David G. Walsh:**[3] Chief executive officer, president, and chairman of the board of directors of Bre–X; chief executive officer, president, and chairman of the board of Bresea;

**Jeannette Walsh:** Corporate secretary of Bre–X and Bresea;

**T. Stephen McAnulty:** Vice president of investor relations and director of Bre–X;

**John Thorpe:** Vice president of administration and treasurer of Bre–X; director of Bresea;

**Rolando C. Francisco:** Executive vice president, chief financial officer and director of Bre–X; director of Bresea;

**Hugh C. Lyons:** Director of Bre–X and Bresea;

**Paul M. Kavanagh:** Director of Bre–X.

For the most part, the parties have not made it clear how long each of the Insider Defendants served in their respective positions. It is difficult, therefore, to determine the exact extent of the yearly overlap of the Bre–X board and the Bresea board. However, the Plaintiffs have alleged that

---

1. The following Defendants have not contested personal jurisdiction: J.P. Morgan & Co., Lehman Brothers, Inc., and Nesbitt Burns.

2. Felderhof has not filed a motion contesting personal jurisdiction.

3. David Walsh is now deceased. Jeannette Walsh is now a defendant on behalf of herself and as the executor of David Walsh's estate.

at all relevant times Bresea representatives made up a majority of the Bre–X board. In their Second Amended Class Action Complaint, the Plaintiffs allege that "[d]uring the Class Period, Bresea and Bre–X shared three out of four directors, and four officers, in common." (Second Amended Class Action Complaint ("Complaint"), Dkt. # 207, ¶ 32.) Also, the Plaintiffs provided an affidavit showing that as of March 10, 1997, Bresea representatives held four of the six positions on the Bre–X board. (Miller Aff., Dkt. # 200, Exh. G.)[4] Thus, the Court will assume that at all relevant times Bresea representatives comprised a majority on the Bre–X board and that there was extensive overlap of the companies' officers.

### D. Kilborn Defendants

Defendants P.T. Kilborn Pakar Rekayasa ("P.T.Kilborn."), Kilborn Engineering Pacific Ltd. ("Kilborn Engineering"), and SNC–Lavalin Inc. ("SNC–Lavalin") (collectively, "Kilborn Defendants") provided geostatistical services to Bre–X and issued reports to substantiate the claims of gold. P.T. Kilborn is an Indonesian company. Kilborn Engineering and SNC–Lavalin are Canadian corporations.

## II. PERSONAL JURISDICTION STANDARD

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir.1997) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir.

1985)). "In satisfying the above burden, when the jurisdictional issue is to be decided by the court on the basis of facts contained in affidavits, a party need only present facts sufficient to constitute a *prima facie* case of personal jurisdiction." *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir.1990) (quoting *WNS, Inc. v. Farrow*, 884 F.2d 200, 203 (5th Cir.1989)).

Under this *prima facie* standard, "uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor...." *Id.* at 217 (quoting *D.J. Investments, Inc., v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir.1985)). When a court makes a personal jurisdiction determination without the benefit of deposition testimony or other evidence offered at an evidentiary hearing or at trial, "[p]roof by a preponderance of the evidence is not required."[5] *Id.*

To find personal jurisdiction over a nonresident defendant, the Court must be satisfied that two requirements are met. "First, the nonresident defendant must have purposefully availed himself of the benefits and protections of the [relevant forum] by establishing 'minimum contacts' with that forum...." *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir.1994) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). "[S]econd, the exercise of jurisdiction over the nonresident defendant must not offend 'traditional notions of fair play and substantial justice.' " *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)).

---

4. Bresea's own filings confirm that Bresea representatives held four of the six positions on the Bre–X board in 1997. (*See* Brief in Support of Bresea Resources Ltd's Motion to Dismiss, Dkt. # 74, at 3.)

5. "Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial." *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1271 n. 12 (1983) (quot-

ing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981)). "The trial court has considerable leeway to decide at what stage of the proceedings plaintiff's ultimate showing must be made." *Id.* On February 12, 1999, the Court entertained oral arguments on the pending personal jurisdiction motions; however, this was not an evidentiary hearing.

In this case, the relevant forum for purposes of a due process analysis is the United States. The Plaintiffs' claims arise in part under the Securities Exchange Act of 1934. Section 27 of the Exchange Act, 15 U.S.C. § 78aa, gives a court the authority to serve defendants nationwide, *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1257 (5th Cir.1994), and worldwide, *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir.1972). "[W]hen a federal court is attempting to exercise personal jurisdiction in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Busch*, 11 F.3d at 1258.

"Thus, the Court's analysis must focus on whether the foreign defendants have minimum contacts with the United States sufficient to satisfy due process." *Federal Deposit Ins. Corp. v. Milken*, 781 F.Supp. 226, 229 (S.D.N.Y.1991). Due process requirements are satisfied if the foreign defendants either have engaged in continuous and systematic activities in the United States or if they have "purposefully directed [their] activities at residents of the [United States] and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)) (quotations omitted). Jurisdiction is proper in a forum where a "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

## III. BRESEA

Bresea argues that it is not subject to this Court's jurisdiction because it neither does business nor has a presence in the United States. Stated in due process terms, Bresea asserts that it has insufficient contacts with the United States for this Court to exercise personal jurisdiction over it.

The Plaintiffs contend that Bresea has had ample contacts with the United States to satisfy due process requirements. The Plaintiffs do not argue that the Court has general jurisdiction over Bresea. That is, they do not argue that Bresea has engaged in continuous and systematic contacts with the United States. Instead, the Plaintiffs invoke specific jurisdiction principles, arguing that Bresea "deliberately availed itself of the laws of the U.S. by trading its stock in the U.S. and thereby consented to the jurisdiction of U.S. Courts." (Plaintiffs' Opposition to Additional Motions to Dismiss or Transfer at 48.) They also assert that Bresea is subject to this Court's jurisdiction because it was a "control person" of Bre–X.

### A. Stock Trading

In their response to Bresea's motion to dismiss, the Plaintiffs argue that Bresea availed itself of American laws by permitting and encouraging its stock to be traded over-the-counter in the United States. However, they do not establish this in their response by affidavit or otherwise. The Plaintiffs' Complaint asserts that Bresea stock was traded unlisted, over-the-counter in the United States during the purported class period, but it makes no assertion regarding Bresea's involvement in such trading. (*See* Complaint at ¶ 32.) In other words, the Plaintiffs do not allege in their complaint any Bresea activities that were directed specifically at the United States.

The Plaintiffs do, however, make such allegations in their Supplemental Brief on Personal Jurisdiction Motions ("Plaintiffs' Supplemental Brief"). In that filing, the Plaintiffs allege that Bresea's SEC filings and press releases serve as the minimum contacts needed to support personal jurisdiction.

Although Bresea stock was not traded on a United States exchange, Bresea applied for and was granted during 1986 a 12–g3–2(b) exemption by the SEC. According to Bresea's 1986 annual report, Bresea sought this exemption as part of an effort to "satisfy an expanding shareholder base in the United States...." The same report states that the company's investor relations division initiated discussions with "Market Makers" to trade Bresea shares on the over-the-counter market in the United States. (*See* Miller Aff., Dkt. # 320, Exh. A.)

Bresea's 1987 annual report states that the company "took the initiative of having [Bresea] shares trade in the over-the-counter market in the United States further providing liquidity to our growing American shareholder base and the significant increased interest in Bresea by the American investing public." (*See* Miller Aff., Dkt. # 320, Exh. B.) Also, the company's 1988 annual report indicates that Bresea still had the benefit of the SEC exemption in 1988. (See Miller Aff., Dkt. # 320, Exh. C.) It further indicates that Bresea relied on two United States companies to act as market makers in 1988 for the company's over-the-counter stock trading in the United States.

Based on the information contained in these reports, it is clear that Bresea was actively promoting the over-the-counter sale of its stock in the United States from 1986 through 1988. Bresea also made sixty filings with the SEC between June 3, 1987, and January 9, 1997.[6] (*See* Marek Aff., Dkt. # 174, Exh. A.)

Also, during oral arguments on the instant motions, Plaintiffs' counsel pointed to the affidavit of Robert McBey, which was attached to the Plaintiffs' Supplemental Brief. Plaintiffs' counsel argued that this affidavit establishes that "executives in

Calgary" induced McBey, a resident of the Eastern District of Texas, to buy stock in both Bre–X and Bresea. According to the affidavit, this inducement was carried out through phone calls, facsimile transmissions and mailings, all directed specifically toward McBey in the United States. These activities, the Plaintiffs argue, suffice as the minimum contacts needed to confer personal jurisdiction over Bresea.

The Plaintiffs have misread the McBey affidavit. McBey points only to his contact with Bre–X representatives and to subsequent materials sent to him by Bre–X. It makes no mention whatsoever of any Bresea contacts. Admittedly, McBey's interaction with and receipt of information from Bre–X apparently benefitted Bresea as well as Bre–X (since McBey states he was induced to buy both Bre–X and Bresea stock), but Bre–X contacts which inured to the benefit of Bresea are far different from Bresea itself making contact with this United States investor. In other words, McBey's affidavit would be useful in showing that Bre–X had the requisite minimum contacts with the United States, but it does nothing toward making such a showing with regard to Bresea. Accordingly, the Court need not consider this affidavit any further in this analysis.

In supporting their assertion that Bresea's United States stock trading activities suffice as the requisite minimum contacts, the Plaintiffs rely on *Landry v. Price Waterhouse Chartered Accountants,* 715 F.Supp. 98, 101 (S.D.N.Y.1989). In *Landry,* the court found that it had personal jurisdiction over nonresident defendants who invoked the benefit of trading stock on a United States market. *Id.* at 101. The court reasoned that by engaging in such trading, the defendants knew or should have known they would be amena-

---

**6.** Although the record does not make this abundantly clear, the Court will assume that Bresea's SEC exemption was in effect at least through January 9, 1997, the date of Bresea's last SEC filing, according to information provided by the Plaintiffs. Under this assump-

tion, the exception was in effect during most of the purported class period. The exemption was at least in existence up through some point in 1995, according to Bresea's 1995 annual report. (Wyly Aff., Dkt. # 174, Exhs. 11 through 13.)

ble to suit in the United States. *Id.* Additionally, the court distinguished the case of *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.1975), in which the Second Circuit declined to find personal jurisdiction over a nonresident defendant given that there was no evidence the defendant knew the stock at issue would be sold to United States citizens. *Id.*

The Plaintiffs have at least made a *prima facie* showing that Bresea, by encouraging over-the-counter trading of its stock in the United States, knew or should have known that it would be amenable to suit in the United States. The *Landry* case, unlike the instant case, involved stock that was actually listed on a United States exchange. Nevertheless, the Court cannot seriously entertain the notion that Bresea could have made sixty SEC filings without expecting that it would be amenable to United States securities laws. Like the defendants in *Landry,* and unlike the defendant in *Bersch,* Bresea knew that the stock at issue would be sold to United States citizens. In fact, Bresea encouraged such sales through the over-the-counter market.

█ Furthermore, the Plaintiffs have made at least a *prima facie* showing that this securities fraud action arose out of these allegedly fraudulent filings. As the Second Circuit noted, "SEC filings generally are the type of devices that a reasonable investor would rely on in purchasing securities of the filing corporation." [7] *Itoba v. Lep Group PLC,* 54 F.3d 118, 123 (2d Cir.1995) (internal quotations omitted).

Bresea's SEC filings and other efforts to facilitate over-the-counter trading of its stock in the United States serve as the requisite minimum contacts in this personal jurisdiction analysis. Furthermore, there is nothing unfair about subjecting Bresea to the jurisdiction of this Court. The Plaintiffs have carried their burden in making a *prima facie* showing that this

Court has personal jurisdiction over Bresea. For the sake of completeness, the Court will also examine the Plaintiffs' contention that jurisdiction over Bresea can be supported under the "control person" theory.

### B. Control Person Theory

The Plaintiffs also contend that the Court has jurisdiction over Bresea because it is a "controlling person" of Bre–X within the meaning of § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), which reads:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be jointly and severally ... liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

This "statute has been read liberally and its 'provisions were enacted to expand, rather than restrict the scope of liability under the securities laws.'" *Landry,* 715 F.Supp. at 102 (quoting *Securities Exchange Commission v. Management Dynamics, Inc.,* 515 F.2d 801, 812 (2d Cir. 1975)).

As the Fifth Circuit has noted, regulations further define the standard for a controlling person as follows:

> The term "control" ... means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

*G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957 (5th Cir.1981) (quoting 17 C.F.R. § 230.405(f) (1979)). "[E]ven 'indirect means of discipline or influence short of actual direction' fulfill the statutory requirement." *Landry,* 715 F.Supp. 98, 102

---

7. The Court is aware that the stock at issue in *Itoba* was traded on an American exchange whereas Bresea stock was only traded over-the-counter. However, this distinction is irrelevant.

n. 11 (quoting *Myzel v. Fields*, 386 F.2d 718 (8th Cir.1967)).

The first question the Court must address is whether the control person standard automatically encompasses a jurisdictional inquiry. In other words, if Bresea fits the definition of a control person, is it automatically subject to the jurisdiction of United States courts, or must there still be separate, minimum contacts under the due process standard? [8]

Bresea suggests that even if it fits the definition of a control person, the Court must still separately be satisfied that the due process test is met with regard to personal jurisdiction. Bresea's counsel advanced this argument during the February 12, 1999, hearing, citing only *Federal Deposit Insurance Corporation v. Milken*, 781 F.Supp. 226 (S.D.N.Y.1991). Under Bresea's reading of this case, the court found the issue of control person liability to be something separate from the issue of personal jurisdiction.[9] (*See* Transcript of February 12, 1999, hearing at 18.) The Court is not convinced that the pronouncement in *Milken* is as broad as the Plaintiffs have interpreted it.

■ Furthermore, other courts have found that control person liability serves as a basis for finding personal jurisdiction. *See San Mateo County Transit Dist. v. Dearman, Fitzgerald and Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir.1992) (standard for personal jurisdiction is met if plaintiff makes nonfrivolous allegation that defendant is controlling person); *see also Derensis v. Coopers & Lybrand Chartered*

*Accountants*, 930 F.Supp. 1003, 1014 (D.N.J.1996); *Landry*, 715 F.Supp. at 102. In light of this authority, the Court has personal jurisdiction over any Defendant as to which the Plaintiffs make a *prima facie* showing of control person liability.

■ The next inquiry is whether the Plaintiffs have made a *prima facie* showing that Bresea was a controlling entity of Bre–X. Such a showing has been made through the Plaintiffs' Complaint and subsequent filings.

In their Complaint, the Plaintiffs allege that Bresea had involvement in the day-to-day operations of Bre–X. (Complaint at ¶ 270.) They also allege that Bresea "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of [Bre–X], including the content and dissemination of the various statements which plaintiffs contend are false." (Complaint at ¶ 269.) Furthermore, they allege that Bresea owns approximately 25 percent of Bre–X, and that Bresea and Bre–X had extensive overlap in their director and officers. (Complaint at ¶ 32.) As explained above, the Court assumes that at all relevant times Bresea representatives comprised a majority on the Bre–X board and that there was extensive overlap of Bre–X and Bresea officers. Based upon these facts, the Plaintiffs have made a *prima facie* showing that Bresea was a controlling entity of Bre–X.

In arguing that it is not a controlling entity of Bre–X, Bresea relies in its briefing on *Milken*.[10] It is unclear to the Court

**8.** Obviously, this question is only academic with regard to Bresea given the Court's finding that the requisite minimum contacts exist with regard to this company. However, this question becomes more important with regard to other Defendants, as developed more fully below.

**9.** Specifically, the court stated: "The parties' debate in their briefs regarding whether or not culpable participation is an element of a *prima facie* case of control person liability under the securities laws[.] [This issue] is not germane to the issue of personal jurisdiction

and need not be addressed in this decision." *Milken*, 781 F.Supp. at 234.

**10.** This reliance is puzzling given Bresea's subsequent argument during the hearing on the instant motions that the court in *Milken* refused to consider control person liability as a means of establishing personal jurisdiction. If the *Milken* court did not consider control person liability, how could this case be helpful in showing that Bresea is not subject to this type of liability?

whether the *Milken* court examined which types of relationships give rise to control person liability, or whether the court undertook a separate minimum contacts analysis. In either case, the situation in *Milken* is distinguishable from the instant facts.

First, the *Milken* court held that a parent-subsidiary relationship does not itself create jurisdiction. 781 F.Supp. at 230. Relatedly, the court held that the plaintiffs could not "base their claim for jurisdiction over the person merely on the defendants' parentage of a corporation in this forum." *Id.* As explained above, the Plaintiffs in this action allege more than the fact that Bresea owned a significant percentage of Bre–X.

Also, in finding that it did not have personal jurisdiction over the foreign defendants, the court in *Milken* found it significant that the plaintiffs failed to allege that "any particular [polices of the company alleged to be controlled] were affected by the minority representation of the foreign defendants on the [board of the company alleged to be controlled.]" *Id.* The instant case is distinguishable. First, Bresea representatives made up a majority of the Bre–X board, not a minority as in *Milken.* Second, the Plaintiffs in this action, unlike the *Milken* plaintiffs, have alleged that particular Bre–X policies were affected by Bresea.

In *Harriman v. E.I. DuPont De Nemours & Co.,* 372 F.Supp. 101, 105 (D.Del. 1974), the court recognized that the "indirect means of discipline or influence" needed to establish control person liability may arise from interlocking directors. That is the situation with Bre–X and Bresea. The Plaintiffs have made a clear showing regarding extensive presence of Bresea representatives on the Bre–X board and in the ranks of its officers. This presence certainly gave Bresea the ability to affect Bre–X policies.

In light of this showing, the Court is of the opinion that the Plaintiffs have made a *prima facie* showing of control person liability against Bresea.[11] Accordingly, the Plaintiffs have made a *prima facie* showing that this Court has personal jurisdiction over Bresea.

## IV. INSIDER DEFENDANTS

The Plaintiffs assert that this Court has personal jurisdiction over the Insider Defendants due to their activities as officers and directors of Bre–X. Primarily, the Plaintiffs contend that these Defendants subjected themselves to United States jurisdiction by their approval of and/or involvement in preparing various SEC filings and press releases of Bre–X.

The Plaintiffs assert that the Court has personal jurisdiction over the Insider Defendants because these Defendants were controlling persons of Bre–X. The Fifth Circuit examined a similar assertion in *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945 (5th Cir.1981). In that case, the court found a defendant subject to control person liability based upon the fact that the defendant had the following relationship with the controlled company: the defendant owned 24 percent of the company's stock; he was an officer and director of the company; and he was involved in the day-today coordination of the company's business activities. *Thompson,* 636 F.2d at 958.

Based upon these facts, the court held that the defendant "had the requisite power to directly or indirectly control or influence corporate policy." *Id.* In reaching its conclusion in *Thompson,* the Fifth Circuit "rejected the contention that actual participation in the transaction underlying the violation was a prerequisite for a *prima*

11. This conclusion is supported by information found in Bresea's own annual reports. In the company's 1993, 1994 and 1995 annual reports, Bresea's Bre–X investment was accounted for using the "equity method."

According to the reports, this method was used only for investments in companies over which Bresea "exercises significant influence." (*See* Wyly Aff., Dkt. # 174, Exhs. 11–13.)

*facie* case [of control person liability.]" *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir.1993). "At the same time, [the court in *Thompson*] noted that [Fifth Circuit] precedent was 'ambiguous on whether effective day-to-day control [of the general affairs of the company] is required[.]'" *Id.* (quoting *Thompson*, 636 F.2d at 958 n. 24) (internal quotations omitted).

■ Thus, it was clear after *Thompson* that the Fifth Circuit does not require actual participation in the underlying transaction in order to find control person liability. It is enough if the defendant had the *ability* to control the conduct in question. However, the following question remained: In order to find that a defendant is a controlling person, must that defendant have actually participated in the general, day-to-day operations of the company in question, or is it enough if the defendant merely had the *ability or power* to do so? The Fifth Circuit again declined to answer this question in *Abbott*. 2 F.3d at 620.

At least one circuit, however, has answered this question:

> [T]he Eighth Circuit ... established a two-prong test for a *prima facie* case for controlling person liability: (1) "that the defendant [ ] actually participated in (*i.e.* exercised control over) the operations of the corporation in general"; and (2) "that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but [plaintiff] need not prove that this later power was exercised."

*Abbott*, 2 F.3d at 620 (quoting *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985)) (as altered in *Abbott*).

As noted above, it is clear that the Fifth Circuit squarely follows the second prong of this test. The Fifth Circuit has not

decided whether it would follow the first prong, but it suggested in *Abbott* that it would not. *See Abbott*, 2 F.3d at 620 n. 18. As the court noted in *Abbott*, adopting the first prong of the test would "not accurately reflect our rejection in *Thompson* of a 'culpable participation' requirement." *Id.*

Therefore, in undertaking this analysis, the Court will find control person liability if the Plaintiffs make a *prima facie* showing that the Defendant in question had the *power* (whether exercised or not) to control the transactions in question and to control the operations of Bre–X in general. In other words, it is enough if the Defendant simply had the abstract power to control. Actual exercise of that power is not required.[12]

### A. David Walsh

■ At the time of the alleged violations, Walsh was a Canadian resident. He later moved to the Bahamas. As a nonresident Defendant, Walsh argues that he is not subject to the personal jurisdiction of this Court. The Plaintiffs assert that this Court has jurisdiction over Walsh based on the following theories: (1) Walsh was a controlling person of Bre–X; (2) Walsh had the requisite minimum contacts with the United States; and (3) Walsh is subject to jurisdiction under the "co-conspirator doctrine." Because the Court finds that personal jurisdiction is supported by the first and second theories, it need not address the third.

In attempting to make a *prima facie* showing of personal jurisdiction over Walsh, the Plaintiffs point to the following:

(1) Walsh was founder, president, chief executive officer and chairman of the board of Bre–X. (Complaint at ¶ 34; Miller Aff., Dkt. # 200, at ¶ 6.)

---

12. The Court recognizes that other jurisdictions have taken a different approach. In fact, one court has described the Eighth Circuit test as "the most widely used test for determining whether a defendant is liable as a controlling person." *See Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir.1996) (collecting cases). As noted above, however, the Fifth Circuit has suggested that it would not follow this test.

(2) Walsh was responsible for raising capital for Bre–X from the public. (Walsh Aff., Dkt. # 224, at ¶ 7.) Relatedly, the Bre–X board, of which Walsh was a member, reviewed Bre–X's NASDAQ application. (McAnulty Aff., Dkt. # 149, at ¶ 13; Lyons Aff., Dkt. # 43, at ¶ 6)

(3) Walsh signed allegedly false SEC filings, related to alleged fraud, on behalf of Bre–X. (Complaint at ¶ 154.)

(4) Walsh prepared and issued numerous allegedly false statements and press releases concerning Bre–X's gold reserves which were distributed in the United States. (Complaint at ¶¶ 210, 237; Plaintiffs' Opposition to Defendant David Walsh's Motion to Dismiss for Lack of Personal Jurisdiction, Dkt. # 242, Exh. B; Wyly Aff., Dkt. # 174, Exh. 1 at 12; Exh 3 at 11; Exh. 6 at 2.)

Taking the above facts as true, the Court has determined that the Plaintiffs have made a *prima facie* showing that Walsh was a controlling person of Bre–X. Given his position as Bre–X's president, CEO, chairman, and fundraiser, Walsh had the ability to control the general operations of the company. Additionally, the Plaintiffs' evidence establishes that Walsh not only had the ability to control the challenged activities, but also that he directly exercised control over those activities by issuing allegedly false statements and signing false SEC filings.

The Court finds support for this conclusion in *Safeway Portland Employees' Federal Credit Union v. C.H. Wagner & Co., Inc.*, 501 F.2d 1120 (9th Cir.1974) (cited with approval in *Thompson,* 636 F.2d at 958). In *Wagner,* the Ninth Circuit found a defendant subject to control person liability based on the following facts: (1) she was one of three directors of the controlled company; (2) she was an officer of the company; and (3) she and her husband owned 94 percent of the company's stock.

*Id.* at 1124. The court also determined that another defendant was a controlling person merely based on the fact that he was an officer and one of three directors of the company. *Id.*

The Court is also persuaded by the holding in *Dyer v. Eastern Trust & Banking Co.,* 336 F.Supp. 890 (D.Maine 1971) (cited with approval in *Thompson,* 636 F.2d at 958). The Fifth Circuit read this case as standing for the proposition that a *prima facie* case of control person liability is made out when a defendant is "shown to be one of 12 active directors controlling [the] corporation." *Thompson,* 636 F.2d at 958.

Finally, the instant situation is analogous to the facts in *Landry v. Price Waterhouse Chartered Accountants,* 715 F.Supp. 98 (S.D.N.Y.1989) and *Derensis v. Coopers & Lybrand Chartered Accountants,* 930 F.Supp. 1003, 1014 (D.N.J.1996). In *Landry,* the court found control person liability over a defendant who invoked the benefit of trading stock on the NASDAQ and became a "behind the scenes player" in a transaction that had an impact on the value of the stock in question. *Landry,* 715 F.Supp. at 102. The Plaintiffs have shown that Walsh engaged in similar activities on behalf of Bre–X.

In *Derensis,* the court found the nonresident defendants to be controlling persons based on the fact that they, as officers and directors of the controlled corporation, approved and disseminated financial statements knowing they would affect the price of the company's NASDAQ stock. *Derensis,* 930 F.Supp. at 1014. The Plaintiffs have made a showing that Walsh engaged in substantially similar activities on behalf of Bre–X.

The Plaintiffs have made a *prima facie* showing that Walsh was a controlling person of Bre–X. Therefore, the Plaintiffs have made a *prima facie* showing that Walsh is subject to the jurisdiction of this

Court.[13]

## B. Other Insider Defendants

█ In light of the above authority, the Court also finds that is has jurisdiction over the remaining Insider Defendants. The Court will now review the facts it considered in making this determination.

### 1. Jeanette Walsh

Jeanette Walsh was a senior officer of Bre–X (corporate secretary), and she was responsible for Bre–X's "administration and regulatory filing requirements." [14] (Plaintiffs' Opposition to Defendant Jeanette Walsh's Motion to Dismiss for Lack of Personal Jurisdiction, Dkt. # 218, Exh. A at 4.; J. Walsh Aff., Dkt. # 203, ¶ 6.) There is also evidence indicating that as an officer, she assisted in preparing and reviewing the allegedly fraudulent press releases. (Wyly Aff., Dkt. # 174, Exh. 1 at 11, Exh. 4 at 53.)

### 2. Stephen McAnulty

McAnulty was the vice president of investor relations and a director of Bre–X. (Miller Aff., Dkt. # 200, ¶ 6). As such, he participated in Bre–X Board discussions which led to authorizing Bre–X management to apply for a NASDAQ listing. (McAnulty Aff., Dkt. # 149, ¶ 13.) He was involved in preparing the allegedly false press releases. (Wyly Aff., Dkt. # 174, Exh. 1 at 12, Exh. 3 at 11, Exh. 4 at 53; Francisco Aff., Dkt. # 128, ¶ 16.) Via telephone, he promoted Bre–X stock to an investor in the United States. (McBey Aff., Dkt. # 161, ¶ 3.)

### 3. Hugh Lyons

Lyons was a director of Bre–X. (Miller Aff., Dkt. # 200, ¶ 6.) As such, he was involved in board discussions that resulted in authorizing Bre–X management to apply for a NASDAQ listing, (Lyons Aff., Dkt. # 43, ¶ 6), and he assisted in writing the allegedly false press releases (Wyly Aff., Dkt. # 174, Exh. 3 at 11). Additionally, Lyons signed Bresea's 1994 annual report, which was filed with the SEC. (Wyly Aff., Dkt. # 174, Exh. 12.)

### 4. John Thorpe

Thorpe was the vice president of administration and treasurer of Bre–X. (Plaintiffs' Opposition to Defendant Jeanette Walsh's Motion to Dismiss for Lack of Personal Jurisdiction, Dkt. # 218, Exh. A at 4) As an officer, he reviewed at least some of the allegedly false press releases. (Wyly Aff., Dkt. # 174, Exh. 1 at 11.) Also, he signed Bre–X's Form 6–K filed with the SEC in 1996. (Wyly Aff., Dkt. # 174, Exh. 10.)

### 5. Rolando Francisco

Francisco was executive vice president, chief financial officer, and director of both Bre–X and Bresea. (Miller Aff., Dkt. # 200, ¶ 6.) He reviewed the allegedly false press releases issued by Bre–X. (Wyly Aff., Dkt. # 174, Exh. 1 at 12, Exh. 3 at 11.) Francisco also signed Bresea's 1995 annual report, which was filed with the SEC. (Wyly Aff., Dkt. # 174, Exh. 13.)

### 6. Paul Kavanagh

Kavanagh was a Bre–X director. (Miller Aff., Dkt. # 200, ¶ 6.) He assisted in writing the allegedly false press releases (Wyly Aff., Dkt. # 174, Exh. 3 at 11.) He also made representations to United

---

**13.** Jurisdiction could also be based on Walsh's contacts with the United States. For example, Walsh's approval of the allegedly false SEC filings is adequate to establish jurisdiction. *See Itoba Ltd. v. LEP Group PLC,* 930 F.Supp. 36, 40–41 (D.Conn.1996) (nonresident defendant who approved false SEC filing subject to personal jurisdiction in United States); *see also Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241 (S.D.N.Y.1984).

**14.** J. Walsh's counsel would have the Court believe she was merely a "typing secretary." (Transcript of February 12, 1999, hearing at 37.) However, the Plaintiffs have offered evidence to the contrary, which the Court must take a true.

States stock analysts regarding the potential of Bre–X's Busang resource. (Troise Aff., Dkt. # 48, Exh. B at 2.)

### 7. Conclusion

Based on these facts, and in light of the above authority, the Court has determined that the Plaintiffs have made a *prima facie* showing that all of these Defendants have at least the ability to directly or indirectly influence both the general operations of Bre–X and the conduct in question. Therefore, the Plaintiffs have made a *prima facie* showing that these Defendants are controlling persons of Bre–X. *See Thompson,* 636 F.2d at 958; *Wagner,* 501 F.2d 1120; *Derensis,* 930 F.Supp. 1003; *Landry,* 715 F.Supp. 98; *Dyer,* 336 F.Supp. 890.

Also, every Insider Defendant engaged in one or more of the following activities: securing Bre–X's NASDAQ listing; approving and/or signing the allegedly false Bre–X or Bresea SEC filings; reviewing and/or writing the allegedly false press releases; promoting Bre–X to investors and analysts in the United States. Given this, the Court is satisfied that the Plaintiffs have made a *prima facie* showing that the remaining Insider Defendants engaged in the requisite minimum contacts with the United States to support this Court's jurisdiction over them. *See Itoba,* 930 F.Supp. at 40–41; *Reingold,* 599 F.Supp. 1241.

## V. KILBORN DEFENDANTS

The Kilborn Defendants contend that this Court does not have jurisdiction over them because they have not had the requisite contact with the State of Texas. They do not argue that jurisdiction over them is improper under the national contacts standard, which this Court is applying. Because these Defendants apparently concede that this Court's jurisdiction is proper under the national contacts standards, and because the Plaintiffs have made a *prima facie* showing of personal jurisdiction with regard to these Defendants, the Court denies their motions to dismiss for lack of personal jurisdiction.

## VI. CONCLUSION

The Plaintiffs have made a *prima facie* showing that this Court has personal jurisdiction over all the Defendants who have challenged it. Therefore, it is hereby

ORDERED that the following motions are DENIED: Bresea's Motion to Dismiss (Dkt.# 73); Walsh's Motion to Dismiss (Dkt.# 224); J. Walsh's Motion to Dismiss (Dkt.# 203); Francisco's Motion to Dismiss (Dkt.# 108); Thorpe's Motions to Dismiss (Dkt. 56, 240); McAnulty's Motion to Dismiss (Dkt.# 149); Lyons' Motions to Dismiss (Dkt. 41, 235); and Kavanagh's Motion to Dismiss (Dkt.# 67). It is further

ORDERED that the following motions are DENIED IN PART: P.T. Kilborn's Motion to Dismiss (Dkt.# 232); Kilborn Engineering's Motion to Dismiss (Dkt.# 38); and SNC–Lavalin's Motion to Dismiss (Dkt.# 59).